[Civ. No. 60299. Second Dist., Div. Five. Oct. 27, 1981.]

RICHARD P. STEVENS et al., Plaintiffs and Appellants, v. CITY OF GLENDALE et al., Defendants and Respondents; HENSLER-MacDONALD, Real Party in Interest and Respondent.

COUNSEL

Jones & Jones and Arthur T. Jones for Plaintiffs and Appellants.

Frank R. Manzano, City Attorney, and Dennis H. Schuck, Senior Assistant City Attorney, for Defendants and Respondents.

Davis, Tharp & Berg and Richard G. Berg for Real Party in Interest and Respondent.

OPINION

SHELDON, J.*—Richard P. Stevens and Chevy Chase Estates Association were the petitioners below and are the appellants. City of Glendale, Glendale City Council and individual members thereof are the respondents. Hensler-MacDonald, a joint venture, is the real party in interest (RPI).

Appellants filed a petition for writ of mandate and alternative writ of mandate pursuant to Code of Civil Procedure section 1085 wherein they sought to challenge the legal sufficiency of the City of Glendale's general plan and the housing element contained therein. In addition, pursuant to Code of Civil Procedure section 1094.5, they also challenged the legality of environmental impact report (EIR) No. 77-28, pertaining to tentative tract No. 32844 as adopted December 12, 1978, and sought to have set aside the notice of determination recorded on December 18, 1978, regarding this EIR and the related subdivision. In this respect, the appellants sought to compel the city to reopen its hearing on the EIR and publish a final EIR in conformity with the California Environmental Quality Control Act (CEQA) of 1970 and the guidelines published in support thereof.

Appellants also filed a petition for attorneys' fees and costs.

The trial court signed a judgment granting the peremptory writ of mandate as to a particular aspect of the proceedings, to be discussed below. The request for attorneys' fees and costs were denied.

Appellants appeal from this judgment and the order denying attorneys' fees and costs.

---

*Assigned by the Chairperson of the Judicial Council.

FACTS

On March 25, 1977, the RPI filed its application for approval of tentative subdivision map No. 32844 involving originally the construction of 830 single family residences on 309 acres of undeveloped hillside canyons in the San Rafael Hills section of Glendale.

On June 13, 1978, a notice of completion of a draft EIR (No. 77-28) was filed with the Secretary for Resources of the State of California. The draft EIR was made public on that date and public comment was solicited.

Respondents transmitted copies of the draft EIR to all responsible and interested agencies, including appellants, and also transmitted summaries of the draft EIR to 218 property owners within 300 feet of the proposed project.

On October 10, 1978, a joint public hearing on the draft EIR was held before the city council and the Environmental and Planning Board (EPB) of the City of Glendale. Adequate notice of this meeting was given, and public comment was orally received. After the hearing, the city council referred the project back to the EPB for further recommendations.

The EPB at its meeting on November 8, 1978, adopted the following "'proposed mitigation measures': (1) That 'A' Street be extended from the northerly boundary of the project site to connection [sic] with Camino San Rafael in Tract No. 31772, also known as the Emerald Isle Tract; (2) That the primary ridgeline in the project be retained in a natural state; and (3) That the number of housing units in the project be reduced."

On November 20, 1978, the RPI submitted to the planning department a revised tentative tract map which provided for the required mitigation measures. Based upon this revised tentative tract map and the independent evaluation and analysis of the environmental impacts by its staff, the EPB on November 29, 1978, submitted a proposed final EIR to the city council.

On December 12, 1978, the city council held a hearing on the final EIR, but did not give public notice of the revision extending "A" Street

to the Emerald Isle tract. However, appellants and their attorney were present at the meeting and objected to the sufficiency of the EIR because it did not subject the extension of "A" Street to the Emerald Isle tract to public review.

The trial court found that this "extension of 'A' Street constituted a change in the project which required major revisions to the EIR due to the involvement of new environmental impacts not considered in the draft EIR, said revisions were incorporated in the final EIR."

Because of the failure to give the public notice, the trial court found that respondents had prejudicially abused their discretion, and accordingly, granted the writ of mandate commanding respondents to:

"1. Vacate and set aside the notice of determination recorded on or about December 18, 1978 with respect to the certification of Environmental 600 Impact Report No. 77-28 pertaining to tentative tract map No. 32844.

"2. Vacate and set aside its approval of tentative tract map No. 32844.

"3. To resume proceedings to process EIR No. 77-28 by providing notice to the public of the major revisions to the EIR due to the involvement of new environmental impacts not considered in the draft EIR and to give the public reasonable opportunity to review and comment on said EIR prior to certification and *otherwise comply with CEQA* (italics added) and the State Guidelines.

"4. To refrain from approving revised tentative tract map No. 32844 until it has complied with the requirements of CEQA."

As to the approval of the subdivision itself, adequate public notice was given, as well as notice to the appellants, and an opportunity for them to be heard. Approval of tentative tract No. 32844 was given at a council meeting on December 12, 1978.

The trial court found that respondents had proceeded according to the requirements of the Subdivision Map Act in approving tentative tract No. 32844 except as stated above in the final approval of the EIR.

I

■ Does the Glendale general plan contain all of the legally required elements, and is the Glendale housing element contained therein legally sufficient?

The Legislature has gathered the land use laws under a single title of the Government Code entitled "Planning and Land Use."[1]

The State Department of Housing and Community Development was authorized to develop and publish guidelines for the preparation of the housing element of the plan. This department's guidelines were promulgated in 1973 and codified in California Administrative Code, title 25, sections 6300 through 6350.

In March of 1972 the City of Glendale adopted the 1990 open space recreation and conservation elements of the Glendale general plan with additional elements added from time to time, including the adoption of the housing element on July 15, 1975, and amended on August 1, 1978.

Appellants quoted from the case of *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 at page 785 [42 Cal.Rptr. 283] in characterizing the general plan as follows: "The adoption of the general plan is, in effect, the adoption of a policy, and in many respects, entirely new policy. The plan is of permanent and general character, it is a declaration of public purpose and, as such, supposedly sets forth what kind of a city the community wants and, supposedly, represents the judgment of the electors of the city with reference to the physical form and character the city is to assume."

The housing element guidelines (Cal. Admin. Code, tit. 25, §§ 6300-6350) contain the following provisions: "6310. Scope and Goals. At least four broad goals of a housing element have been identified. The

---

[1] Government Code section 65302 provides: "The general plan shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals. The plan shall include the following elements: ... [¶] (c) A housing element, to be developed pursuant to regulations established under Section 41134 of the Health and Safety Code, consisting of standards and plans for the improvement of housing and for provision of adequate sites for housing. This element of the plan shall make adequate provision for the housing needs of all economic segments of the community."

goals listed below may be expanded to include others of local concern and impact.

"(a) To promote and insure the provision of adequate housing for all persons regardless of income, age, race, or ethnic background.

"(b) To promote and insure the provision of housing selection by location, type, price and tenure.

"(c) To promote and insure open and free choice of housing for all.

"(d) To act as a guide for municipal decisions and how these decisions affect the quality of the housing stock and inventory."

Section 6340 provides that other elements must be correlated with the housing element, including the following: Land use, circulation, noise, open space, conservation and seismic safety.

The housing element of the City of Glendale, adopted July 15, 1975, lists as its goals the following: (1) Expand the range of housing opportunities for every Glendale citizen; (2) improve the quality of the city's housing supply; (3) establish free access of all persons to all types of housing without restrictions based on race, color, creed, sex or national origin; (4) ensure that new housing enhances the total environment and family life styles. The objectives for each goal are set forth in the elements.

Data representing the major overall physical, social and economic findings associated with Glendale's housing is reported in detail.

The following are the areas of a detailed analysis and their mitigation measures: (1) Air quality, (2) water/earth resources, (3) biological resources, (4) noise, (5) urban development, (6) service systems, (7) public facilities, (8) parks and recreation, (9) archaeological and historic resources, (10) community attitudes, (11) social, (12) economics, (13) aesthetics, (14) energy, (15) traffic and transportation.

Problems which were noted in the above areas were mitigated by the reduced number of units, more park area, dedication of land for a school, maintaining the ridgeline, and the extension of "A" Street.

The housing element analyzes the housing problem issues in Glendale and makes recommendations for solution of the problems. The element also includes a breakdown of the city by communities, with an inventory and analysis of the housing units in each community. Proposed recommendations are set forth for each community.

An amendment to the housing element was adopted July 17, 1978, which further expanded the goals of the element. When read as a whole, the housing element coordinates with the other elements of the Glendale general plan and complies with the housing element guidelines.

The 1990 open space, recreation and conservation element "has as its primary consideration the existing and proposed public land available to the city's residents. A review of the number and location of commercial and quasi-public recreational facilities is also included to point out the extent of the private supply of open space and recreational opportunities. These vary from golf courses to church activities."

The project, which is the subject of this action, is located in the community designated as "the San Rafael Hills." The open space plan states: "One of the priorities for the San Rafael Hills, as for the Verdugo Mountains, will be the preservation of the ridge lines." Included in the final map of the project, in addition to expanded park areas and recreation areas, was the ridge all of which was left as open space.

In the housing element the land through which the extension of "A" Street would go was designated for either acquisition or *regulation*. The mitigation measure which required the extension of "A" Street through a V-cut in the ridge line specified in detail how the slopes should be cut, the kind of landscaping to be allowed, and the type of review to be conducted by the public works division and geologist. It further regulated the size, shape, width, grade and contours of the cut as well as other details.

The open space element provides for methods for open space and conservation preservation and contains the following provision: "Open spaces can be controlled through regulatory means including zoning and subdivision control."

The draft EIR, which was prepared by Olson Laboratories, a privately employed company, contained an extensive analysis of the traffic

volume, its flow and impact on the different areas. The report concluded that a third access point was crucial. The extension of "A" Street would mitigate this problem. However, the environmental effects of this extension as part of the final EIR were never noticed for a hearing. Accordingly, input from responsible agencies and from the public was not obtained. Potential effects of the extension of "A" Street could be (1) additional traffic use; (2) increase in ambient noise; (3) exposure of people or structures to major geologic hazards; and (4) disruption or division of the physical arrangement of an established community.

The draft EIR considered the following alternatives to the project: (1) No project alternative; (2) filled area alternative; (3) clustered development alternative; (4) ridgetop preservation alternative.

In selecting an alternative, CEQA guidelines require that the agency outline specific social, physical, or economic reasons why alternative projects which minimize significant adverse effects cannot be implemented. The draft EIR analyzes the filled area, clustered and ridgetop preservation alternatives, but does not do so for the no project alternative.

Public Resources Code section 21002 provides: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."

After preparation of the draft EIR, mitigation measures were adopted by the EPB as indicated above and were incorporated in the revised tentative tract map. These mitigation measures substantially lessened or avoided significant adverse environmental effects of the project.

*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185 [139 Cal.Rptr. 396], held that where the EIR failed to include a genu-

ine "no project" alternative, the EIR did not comply with CEQA. However, in *Inyo*, the EIR did not fully or fairly describe the project that was in fact involved.. *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, at page 521 [147 Cal.Rptr. 842], held that under CEQA, "if the feasible mitigation measures substantially lessen or avoid generally the significant adverse environmental' effects of a project, the project may be approved without resort to an evaluation of the feasibility of various project alternatives contained in the environmental impact report." The act "does not mandate the choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has reduced environmental damage from a project to an acceptable level."

The draft EIR identified a "no project" alternative but did not give an analysis of it. It is noted that the requirements of Public Resources Code sections 21002 and 21002.1 are alternative rather than conjunctive requirements. Therefore, since feasible mitigation measures were proposed and adopted, as indicated above, the requirements of CEQA in this respect were met.

It is the decision of this court that there was substantial evidence, including that discussed above, introduced at the trial to support the trial court's determination that the respondent's general plan complies with all of the provisions of Government Code section 65302. The evidence further upholds the trial court's determination that the housing element at the time of the approval of the revised tentative tract map No. 32844 complies with Government Code section 65302, subdivision (c), and its guidelines, and contains standards and plans for the improvement of housing and for adequate sites for housing and makes adequate provisions for the housing needs of all economic segments of the community of Glendale.

Although it is not binding on this court, the decision in *Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875 [170 Cal.Rptr. 342], also upheld the legality and sufficiency of this same Glendale housing plan and housing element.

II

█ Are the housing element guidelines merely advisory and not binding upon communities?

As decided above, the Glendale general plan and the housing element are valid under the law; however, appellants raised the question that the guidelines are binding on the local agencies and are not merely advisory.

While California's Planning and Zoning Law, Government Code section 65000 et seq., makes it mandatory for counties and cities to adopt a general plan, it makes the guidelines for the preparation and content of the elements required in the general plan advisory.

Government Code section 65040.2 states in part: "For purposes of this section, the guidelines prepared pursuant to Section 41134 [subsequently reenacted as Health and Safety Code section 50459] of the Health and Safety Code shall be the guidelines for the housing element required by Section 65302." and states further that such *guidelines shall be advisory* to each city and county in order to provide assistance in preparing and maintaining their respective general plans."[2] (Italics added.) This statement is reiterated in Assembly Bill No. 2853 (Gov. Code, § 65585) to become operative October 1, 1981.

The advisory nature of the guidelines is reflected in the holdings of two unpublished cases of California appellate courts: *Lennard* v. *City of El Centro* (Jan. 5, 1977) 1 Civ. No. 34762 and *Save Julland Canyon Committee* v. *Planning Commission of the City of San Diego* (Jan. 5, 1977) 4 Civ. No. 14780. There is no logical reason to give the housing element the weight of binding law and leave the other elements merely advisory.

The appellant contends that the guidelines for the housing element mandate a specific "action" program. In other words, appellant contends that the provisions of Government Code section 65302, subdivision (c), regarding the housing element requires the cities and counties to affirmatively plan in terms of "who, what and when" for the creation of housing.

A review of the housing element of the City of Glendale presents a comprehensive analysis of the present housing inventory and future

---

[2]The housing element guidelines, pursuant to the authority granted in Health and Safety Code section 41134, are promulgated in title 25, California Administrative Code, subchapters 3 and 4, section 6300 et seq., section 6400 et seq.

needs. This issue was presented and discussed in *Bownds* and the court in that decision aptly stated: "In the absence of more specific legislation, it would ill-behoove any court to indirectly mandate such a specific 'action' program under the guise of declaring an otherwise complete and comprehensive plan to be inadequate, basing its decision on nothing more than a subjective interpretation of such nonspecific language."

We hold that the housing element guidelines are merely advisory.

### III

Did the revision of the project by the extension of "A" Street require the preparation of a subsequent or supplemental EIR?

Public Resources Code section 21166, as amended, provides as follows: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent *or supplemental* environmental impact report shall be required *by the lead agency or by any responsible agency,* unless *one or more* of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) *New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available.*"

There is substantial evidence in the record, discussed in part above, to uphold the trial court's finding that "Between the date of the filing of the application for a subdivision by the RPI and the certification of the EIR No. 77-28 by the City Council, the respondents proceeded in a manner provided by the California Environmental Quality Act (CEQA) and the Guidelines and regulations adopted pursuant thereto" except that public notice was not given on the final EIR which included the extension of "A" Street. The evidence in the record discloses that there was extensive public consultation and input from both public agencies and concerned citizens as required by CEQA.

The peremptory writ which the trial court granted ordered the respondents to:

"(1) Vacate and set aside the notice of determination recorded on or about December 18, 1978 with respect to the certification of Environmental 600 Impact Report No. 77-28 pertaining to tentative tract map No. 32844.

"(2) Vacate and set aside its approval of tentative tract map No. 32844.

"(3) To resume proceedings to process EIR No. 77-28 by providing notice to the public of the major revisions to the EIR due to the involvement of new environmental impacts not considered in the draft EIR and to give the public reasonable opportunity to review and comment on said EIR prior to certification and otherwise comply with CEQA and the State Guidelines.

"(4) To refrain from approving revised tentative tract map No. 32844 until it has complied with the requirements of CEQA."

Thus, the effect of the trial court's judgment is to require respondents to go back to the point where the draft EIR was approved, give notice to the public of the proposed revisions to the EIR. At that time, interested parties will have the opportunity to review and comment on the draft EIR. If, at that time it does appear that substantial changes are proposed which will require major revisions of the EIR, then a subsequent or supplemental EIR will be required and a hearing held thereon. The certification of the EIR was vacated and, therefore, the EIR process has not been completed. To require a subsequent or supplemental EIR at this time is premature.

IV

*Attorney's Fees and Costs*

■ Based upon the discussion by the California Supreme Court in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917 [154 Cal.Rptr. 503, 593 P.2d 200] the issue of attorney's fees is predicated on the authority contained in Code of Civil Procedure section 1021.5. The Legislature adopted Code of Civil Procedure section 1021.5 in 1977 authorizing awards of attorney fees under the attorney general doctrine as a codification of the private attorney general doc-

trine that had been developed in numerous prior judicial decisions.[3] The trial court, then, had the discretion to award attorneys' fees to a successful party in an action which resulted in the enforcement of an important right affecting the public interest if a significant benefit has been conferred on the general public or a large class of persons.

The award for attorneys' fees is for a decision which results in the enforcement of an *important* right affecting the public interest. The appellants asserted in their petition violations of what could be deemed "important" rights; however, they prevailed only on a technical point of lack of public notice on the final EIR. Further, appellants did not present adequate evidence that a public interest was affected. The affected parties were adjoining neighbors. The appellants did receive adequate notice of the revised tentative tract map which included the proposed extension of "A" Street. An adjudication was made by the trial court on the issues of the important rights contrary to appellants' requests. This adjudication was supported by findings which in turn were based on substantial evidence. Accordingly, as to the present posture of the case it cannot be said that a significant benefit has been conferred on the general public or a large class of persons.

██ Appellants requested costs to be awarded pursuant to the authority of Code of Civil Procedure section 1032.[4]

Costs will be allowed to a plaintiff upon a judgment in his favor or "if he receives a substantial though partial recovery," 4 Witkin, California Procedure (2d ed. 1971) at page 3246. In the instant case the issues on which appellants prevailed were not "substantial" when compared to the many requests which were denied. The trial court did not abuse its dis-

[3]"Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

[4]Code of Civil Procedure section 1032, subdivision (a), states: "To a plaintiff upon a judgment in his favor; in an action for the recovery of real property; in an action to recover the possession of personal property; in an action for the recovery of money or damages; in a special proceeding; in an action which involves the title or possession of real estate or the legality of a tax, impost, assessment, toll, or municipal fine."

cretion in denying costs and its order is supported by substantial evidence.

The judgment is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.