[No. A021611. First Dist., Div. One. Feb. 24, 1986.]

TERMINAL PLAZA CORPORATION, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant;
JIM PARODI et al., Interveners and Respondents.

**COUNSEL**

Colvin, Martin & Links, Andrew M. Colvin, Dobbs, Berger, Molinari, Casalnuovo, Vannelli & Nadel and Robert D. Links and for Plaintiff and Appellant.

George Agnost, City Attorney, Paula Jesson, Kathryn A. Pennypacker, Melba Yee and Noreen Ambrose, Deputy City Attorneys, for Defendant and Appellant.

Edward G. Weil, Paul Wartelle and Thomas W. Pulliam, Jr., for Interveners and Respondents.

## OPINION

**NEWSOM, J.**—The present appeal comes before us under the following circumstances.

In 1979, the Board of Supervisors of the City and County of San Francisco (hereafter the Board) perceived a serious housing shortage for low income and elderly residents caused by the conversion of residential hotels to tourist hotels or condominiums. In response, on November 23, 1979, the Board enacted a moratorium on the demolition or conversion of residential hotel units.

In February of 1981, the moratorium was replaced with a permanent regulation governing and restricting the conversion of "residential hotels," known as the Residential Hotel Unit Conversion and Demolition Ordinance (Ord. 15-81, ch. 41, San Francisco Admin. Code, hereafter the ordinance). The ordinance was amended and redrafted in June of 1981 (Ord. No. 330-81). Its stated objective is to alleviate the "adverse impact on the housing supply and on displaced low income, elderly and disabled persons resulting from the loss of residential hotel units through their conversion and demolition." (Ord., § 41.2.)[1] Findings were made by the Board in support of the ordinance: a study indicated that residential housing units in the city had decreased dramatically since 1975 due to "vacation, conversion or demolition" of such housing; residential hotel units were declared an endangered housing resource in need of preservation. (§ 41.3.)

The ordinance provides that owners of residential hotel units must obtain a permit from the City and County of San Francisco (hereafter appellant or the City) prior to conversion of the property to any other use. A permit will be granted *only* if the property owner provides relocation assistance to hotel residents and makes a "one-for-one replacement" for the residential hotel units being converted by one of the following methods: 1) constructing the replacement units, 2) rehabilitating an equal number of residential hotel units, or 3) contributing an "in lieu" fee to the City's Residential Hotel Preservation Fund Account in the amount of 40 percent of the construction cost of the number of units converted.

The ordinance defines "residential unit" as a hotel guest room occupied by a permanent resident as of September 23, 1979; a "permanent resident" for purposes of the ordinance is a person who occupied a hotel guest room

---

[1] All further references to the ordinance will be by section number only.

for at least 32 consecutive days on that date. A "residential hotel" is any building containing a "residential unit" as of September 23, 1979. (§ 41.4.)

Exemptions and exceptions are provided in the ordinance. It does not apply to residential hotels which had commenced substantial capital improvements or rehabilitation work prior to the effective date of the ordinance for the purpose of converting the hotel to another use; it also specifically permits a residential hotel to rent any vacant residential unit to tourists during the designated tourist season, May 1 to September 30. (§ 41.16.)

According to the terms of the ordinance, hotel owners and operators are required to submit to the San Francisco Bureau of Building Inspection information on the number of units falling within the residential classification. Then, the number of units the owner is required to maintain for residential use is certified. (§ 41.6.)

Respondent and cross-appellant Terminal Plaza Corporation (hereafter Terminal or respondent) owns real property located at 190 O'Farrell Street in San Francisco. The St. Moritz Hotel is operated on the property by a third-party lessee. Most of the rooms at the St. Moritz Hotel are rented on a monthly basis, and consequently are classified as "residential units" under the ordinance. On October 27, 1981, Terminal's lessee filed an Initial Unit Usage Report with the Bureau of Building Inspection which indicated that as of the effective date of the ordinance the St. Moritz Hotel contained 60 residential units and 15 tourist units. Terminal has not sought to convert the residential units to any other use.

Terminal filed an action for declaratory and injunctive relief, challenging the validity of the ordinance on grounds that it was adopted without prior review by the San Francisco Planning Commission (Planning Commission) in violation of section 7.501 of the San Francisco City Charter; was enacted without proper environmental evaluation as required in the California Environmental Quality Act (Pub. Res. Code, § 21000 et seq., hereafter CEQA); not approved by two-thirds of the voters in the City as mandated by section 4 of article XIIIA of the California Constitution for "special tax" legislation; violates the due process and equal protection clauses of the California and United States Constitutions; and constitutes a "taking" of property for which just compensation to Terminal must be paid. The trial court ruled that the Board violated section 7.501 of the San Francisco City Charter and CEQA by enacting the ordinance without prior review by the Planning Commission or other adequate environmental evaluation, but found in favor of the City on the remaining contentions, and denied Terminal's claim for attorney's fees.

The City filed an appeal; Terminal has cross-appealed.[2] After trial, the Board reenacted the ordinance following a hearing by the City Planning Commission in accordance with section 7.501 and issuance of a "negative declaration" by the City in accordance with the dictates of CEQA.

The City contends that the trial court erred by concluding that the ordinance falls within the terms of section 7.501 of the San Francisco City Charter, which, in pertinent part, provides: "The City Planning Commission shall consider and hold hearings on proposed ordinances and amendments thereto regulating or controlling the height, area, bulk, setbacks, location, use or related aspects of any building or structure or land, including but not limited to the zoning ordinance or other portions of the city planning code . . . ." The City and the interveners argue that section 7.501 has limited application to zoning or similar land use legislation regulating "the distribution and location of uses throughout the City." They suggest that the ordinance does not fall within the category of a zoning law, but rather is merely "legislation of uniform applicability, which does not require the comparative analysis of neighborhood needs," and concerning which the input of the Planning Commission is unnecessary.[3]

Our initial task is to determine the meaning and scope of section 7.501. Established maxims of interpretation provide us with useful guidance. ▉ Our primary goal is to ascertain the legislative intent so that the objective of the law may be effectuated. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Herbert Hawkins Realtors, Inc. v. Milheiser* (1983) 140 Cal.App.3d 334, 338 [189 Cal.Rptr. 450].) ▉ Statutory language must be read in context, keeping in mind the nature and purpose of the enactment, and must be given such interpretation as will promote rather than defeat the objective of the law. (*Pennisi v. Department of Fish & Game* (1979) 97 Cal.App.3d 268, 272 [158 Cal.Rptr. 683]; *Steilberg v. Lackner* (1977) 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378].)

---

[2] A citizen's group intervened in the action and has filed a brief in support of the City's appeal and in opposition to Terminal's cross-appeal.

[3] As a threshold matter, this issue and respondent's contention that the City failed to comply with CEQA requirements have been rendered moot by the Board's reenactment of the ordinance. We nevertheless choose to resolve these challenges to the ordinance for the reason that they present matters of broad public interest that are likely to recur. (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; *District Election Etc. Committee v. O'Connor* (1978) 78 Cal.App.3d 261, 265-266 [144 Cal.Rptr. 442].) The ordinance affects the availability of housing in the City, particularly impacting upon the welfare of low-income and elderly residents. And as the City notes, the ordinance is merely the basis of a legislative scheme; amendments and related laws are probable, and in fact have already been proposed. We also envision the enactment of similar legislation that may raise the same questions. We thus proceed to the merits of these issues.

The language of section 7.501,[4] we observe, mandates Planning Commission consideration of enactments "regulating or controlling the height, area, bulk, setbacks, location, *use* or related aspects of any building or structure." (Italics added.) That the ordinance regulates and controls the *use* of buildings within the City is clear, for it recognizes a property use classification—"residential hotel units"—and prohibits such use from being terminated unless replacement units are provided by the property owner.

Appellant and interveners acknowledge that the ordinance "does indeed impose new restrictions on a particular type and use of property," but insist that the term "use" must be read in light of the more specific provisions of section 7.501: "height, area, bulk, setback and location." They note that the ordinance does not address such specific considerations, nor does it seek to regulate the "appropriate location and structuring of the 'use' which is classified," such as do zoning laws, and for that reason is not governed by section 7.501.

The history and regulatory scheme of which section 7.501 is a part support the City's position. Section 7.501 entitled "Zoning Amendments" appears in the "Zoning Chapter" of the San Francisco City Charter. It was originally adopted as article XVII of the 1929 San Francisco City Charter, which created the Planning Commission to "consider and hold hearings on the proposed changes in the classification of the use to which property in the City and County may be put . . . ." The law was amended over the years until it was enacted in its present form by the voters as Proposition M in 1971. In every instance, this section was treated as a zoning regulation, a practice consistent with the traditional primary role of the Planning Commission to "adopt a land-use plan showing the proposed general distribution and the general location and extent of housing, business industry, recreation . . . and other categories of public and private uses of land . . . ." (S. F. City Charter § 3.524.)

Zoning laws typically regulate such facets of land use as location, height, bulk, setback lines, number of stories and size of buildings, and the use to which property may be put in designated areas. (Gov. Code, § 65860 et

---

[4]In relevant part, section 7.501 provides: "The city planning commission shall consider and hold hearings on proposed ordinances and amendments thereto regulating or controlling the height, area, bulk, setbacks, location, use or related aspects of any building or structure or land, including but not limited to the zoning ordinance and other portions of the city planning code. Such proposals may be initiated by the board of supervisors and referred to the commission, or they may be initiated by the commission itself. In the case of a reclassification of property (change in district boundaries) or establishment, abolition or modification of a setback line, such proposals may be initiated by the application of interested property owners or their authorized agents."

seq.; *Taschner* v. *City Council* (1973) 31 Cal.App.3d 48, 59 [107 Cal.Rptr. 214].) ■ Municipal governments may assume the obligation for zoning legislation, or delegate portions of this responsibility by ordinance to the Planning Commission. (*Lagrutta* v. *City Council* (1970) 9 Cal.App.3d 890, 896 [96 Cal.Rptr. 627].) Under section 7.501 of its Charter, the City of San Francisco has delegated to the Planning Commission the responsibility of reviewing proposed regulations. Such was patently the intent of section 7.501.

■ The ordinance, however, does not regulate land use in the same manner as zoning laws. The nature of buildings or uses permitted in specified districts are not touched upon by the ordinance; nor does it seek to control the dimensions, size, placement or distribution of structures within the City. The ordinance is of general application, and merely regulates existing uses. The regulations governing issuance of conversion permits require purely ministerial acts; the replacement provisions do not call for land use decisions. Consequently, the expertise, judgment and discretion of the Planning Commission were not required to assist in the legislative process leading to enactment of the ordinance. The Board was fully capable of determining the need to preserve residential hotel units and taking steps on its own to prevent the loss of such housing.

We conclude that the scope of section 7.501 cannot be understood to include all regulation of land use by the City. Were we to conclude otherwise, Planning Commission review of a myriad of laws affecting land use in the City—extending even to rent control and general business regulation—would be necessitated. Such an absurd result must be avoided. (*Herbert Hawkins Realtors, Inc.* v. *Milheiser, supra,* 140 Cal.App.3d 334, 338; *City of Costa Mesa* v. *McKenzie* (1973) 30 Cal.App.3d 763, 770 [106 Cal.Rptr. 569].) Instead, our view is that the operative word "use" must be construed with reference to the remaining language of section 7.501 and to the entire statutory scheme of which it is a part. (*Herbert Hawkins Realtors, Inc., supra,* at p. 338.) When so interpreted, in accordance with the clear purpose of the law, the term "use" cannot reasonably be applied to the requirements imposed by the ordinance for conversion and demolition of existing residential hotel units. Accordingly, the trial court erred in finding the ordinance as originally enacted void for failure of the City to comply with section 7.501.

Appellant also challenges the trial court's determination that the ordinance must be declared invalid because of the Board's failure to comply with the CEQA directive to prepare an environmental impact report (EIR) detailing

its effect upon the City. Appellant's contention is that no EIR was required prior to implementation of the ordinance. We disagree.

█ Under CEQA, all local agencies (in this case the Board) (*Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 747 [198 Cal.Rptr. 100]) must prepare an EIR for any project "which *may* have a significant effect on the environment." (Pub. Resources Code, § 21151, italics added; *Bakman* v. *Department of Transportation* (1979) 99 Cal.App.3d 665, 678-679 [160 Cal.Rptr. 583]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 188 [139 Cal.Rptr. 396].) Only where it can be said with certainty that there is *no* possibility the activity in question may have a significant effect on the environment is such activity exempt from requirements of CEQA and thus from further agency evaluation. (Cal. Admin. Code, tit. 14, § 15060; *No Oil, Inc.* v. *County of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) In response to the clearly expressed will of the people, the courts have interpreted this requirement as mandating an EIR whenever it can be "fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc., supra,* at p. 75; *Merz* v. *Board of Supervisors* (1983) 147 Cal.App.3d 933, 936 [195 Cal.Rptr. 370].) "Environment" is broadly defined as "the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, fauna, ambient noise, objects of historic or aesthetic significance."[5] (Cal. Admin. Code, tit. 14, § 15026.)

The City submits that the ordinance merely maintains the status quo and hence cannot have a significant effect on the environment. Respondents argue that the ordinance, and particularly its one-for-one replacement requirements, may alter existing housing patterns and in that manner the impact upon the environment.

We acknowledge that our review of the Board's decision to proceed without an EIR is limited. We must uphold the Board's action if substantial evidence supports the finding that the ordinance will not have a significant environmental impact. (*Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d 740, 748; *Merz* v. *Board of Supervisors, supra,* 147 Cal.App.3d 933, 938.) Nevertheless, we consider the City's status quo argument unsound. The professed objective of the ordinance is to prevent the continued loss of residential hotel units to other uses.

---

[5]"Project" includes any "[a]ctivities directly undertaken by any public agency." (Pub. Resources Code, § 21065) The City concedes that the ordinance is a "project" within the meaning of CEQA.

Moreover, the ordinance clearly portends new construction, for one method by which a conversion permit may be obtained either is construction of replacement units or payment of an in-lieu fee into an account to be used for new construction. The inescapable inference from the record and the substance of the ordinance is that property owners may choose to construct replacement housing or pay an in lieu fee for that purpose in order to obtain approval for conversion. And of course new construction imports the prospect of significant environmental impact.

■ The thrust of our EIR requirement is prospective: it is to provide public agencies and the general public with detailed information about the effect which a proposed project might have on the environment. (Pub. Resources Code, § 21061; *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 405 [151 Cal.Rptr. 866].) " 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance . . . .' " (*Mira Monte Homeowner's Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 365 [212 Cal.Rptr. 127]; quoting from *County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185, 192-193.) ■ If its urgent objectives are to be met, CEQA must be interpreted liberally to afford the fullest possible protection to the environment consonant with the reasonable provisions and scope of the statutory language. (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Mira Monte Homeowner's Assn., supra,* at pp. 365-366; *Whitman* v. *Board of Supervisors, supra,* at p. 405.)

■ It is also settled that CEQA requires a cumulative impact analysis of all reasonably foreseeable future projects. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 73 [198 Cal.Rptr. 634].) Only in this manner can two or more individual effects be considered together to determine the overall environmental impact. (*Ibid.*)

Relying on the rule that remote contingencies and sheer speculation as to future consequences need not be evaluated under CEQA, the City maintains that the impact of possible replacement construction is too amorphous and conjectural to permit accurate assessment. (*Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851, 855-856 [139 Cal.Rptr. 176].) We of course recognize that it is presently impossible to determine with specificity the number, nature or location of replacement construction projects. Until such projects are proposed, their impact—individually and in the

aggregate—cannot be gauged with exactitude. But that the ordinance reasonably portends possible future environmental impacts flowing from the cumulative effect of probable replacement construction projects seems undeniable. And even before specific projects are commenced the City may be able to state—at least in general terms—that the ordinance will have an impact upon the environment, or to dismiss that possibility.[6] Without a threshold evaluation, however, the City leaves its constituents in ignorance of the avoidable dangers CEQA intended to avert. If a "project" poses the possibility of significantly influencing the environment, as the subject ordinance clearly seems to do, the inability of the City to identify impacts ought not to relieve it of the responsibility to prepare an appropriate EIR in accordance with section 21151. We accordingly conclude that the City's failure to comply with CEQA was illegal. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* 151 Cal.App.3d 61, 77.)[7]

In its cross-appeal, Terminal argues that the ordinance was adopted without a two-third's vote of the City electorate as required by article XIIIA, section 4, of the California Constitution (hereafter section 4) for imposition of "special taxes." (*Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 201 [182 Cal.Rptr. 324, 643 P.2d 941].) Terminal contends that the one-for-one replacement provision of the ordinance, particularly the in lieu fee option, constitutes a special tax within the meaning of section 4.

■ The term "special taxes" in section 4 has been defined by our high court "to mean taxes which are levied for a specific purpose rather than . . . a levy placed on the general fund to be utilized for general governmental purposes." (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 57 [184 Cal.Rptr. 713, 648 P.2d 935].) While the ordinance extracts a fee for an acknowledged special purpose—to maintain low-cost housing in residential hotel units—the crucial inquiry is whether the one-for-one replacement provision is a tax at all.

■ The distinction between a tax and other charges, such as assessments or regulatory fees, is somewhat blurred—tax being a term which lacks fixed meaning. "The word may be construed narrowly or broadly depending on its particular context and the purpose for which the definition is to be used."

---

[6] As it did by issuing a negative declaration following the evaluation that preceeded reenactment of the ordinance.

[7] The defect was cured, however, by reenactment of the ordinance following an environment evaluation and issuance of a negative declaration.

(*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 660 [166 Cal.Rptr. 674].) Hence, we must examine the objectives of article XIIIA.

 The common underlying purpose of article XIIIA was to effectuate "effective real property tax relief." (*City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47, 56; quoting from *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 230 [149 Cal.Rptr. 239, 583 P.2d 1281].) In a broader sense, article XIIIA was designed to curtail government spending. (*J. W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745, 754 [203 Cal.Rptr. 580].) Our high court has also noted that "the language of section 4 must be strictly construed and ambiguities therein resolved so as to limit the measures to which the two-thirds requirement applies." (*City and County of San Francisco, supra,* at p. 52.)

 Seen in the context of these rules, fees not exceeding the reasonable cost of providing the service or regulatory activity for which the fee is charged and which are not levied for general revenue purposes, have been considered outside the realm of "special taxes." (Gov. Code, §§ 50075, 50076; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 234 [211 Cal.Rptr. 567]; *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 663 [166 Cal.Rptr. 674].) In *Mills, supra,* at page 663, the court determined that a resolution providing for both increased and new fees for county services associated with processing land-use applications was not a special tax within the meaning of section 4. The court concluded that the phrase "'special taxes' under article XIIIA, section 4 of the California Constitution [does not] embrace fees for land-use regulatory activities where the fees charged to particular applicants do not exceed the reasonable cost of the regulatory activities and are not levied for unrelated revenue purposes." (*Ibid.*)

And in *Trent-Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317 [170 Cal.Rptr. 685], an ordinance requiring a subdivider, as a precondition to obtaining a building permit, to pay fees or dedicate land to a local school district to relieve conditions of overcrowding caused by his development, was found not to impose a "special tax." As in *Mills,* the court cited the rule that "As opposed to taxes which need not be related to benefits received or burdens created (see Witkin, *supra,* p. 3988), these exactions are expressly limited by their enabling legislation to an amount of land or fees which shall bear a reasonable relationship to the need for parks or school facilities generated by the development." (*Id.,* at p. 327.)

The fees called for in the subject ordinance are limited to those necessary to replace converted residential hotel units. None of such fees are earmarked

for general revenue purposes or to pay for a variety of public services. Nor are they imposed upon the land, but rather upon the privilege of converting residential hotel units to other uses. Moreover, the ordinance is not compulsory in nature, since fees are exacted only if the property owner elects to convert his property to another use. And, finally, the regulatory fees imposed by the ordinance have no impact upon general government spending and do not contravene that broad objective of article XIIIA. (*J. W. Jones Companies* v. *City of San Diego, supra,* 157 Cal.App.3d 745, 754.)

Since, simply stated, the ordinance is *not* a revenue producing measure, we find that neither the costs incurred to provide replacement housing nor the *in lieu* fees are in the nature of a "special tax" under section 4. (*J. W. Jones Companies, supra,* at p. 756; *Trent-Meredith, Inc.* v. *City of Oxnard, supra,* 114 Cal.App.3d 317, 325; *Mills* v. *County of Trinity, supra,* 108 Cal.App.3d 656, 663; *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 984-985 [156 Cal.Rptr. 777].) The ordinance therefore did not require two-thirds voter approval for its enactment.

Terminal next contends that the ordinance violates the due process and equal protection clauses of the California and United States Constitutions. The focus of this claim is upon the impact of the ordinance, which, Terminal submits, forces residential hotel operators to remain in that business rather than convert their property to other uses. Terminal's position is that it has a *fundamental* right to "go out of business," which has been abridged by the ordinance without the requisite justification of a compelling state interest.

Our review proceeds from established principles of constitutional law. " ' ' "All presumptions and intendments favor the validity of a statute and mere doubt will not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears . . . ." ' " (*In re Ricky H.* (1970) 2 Cal.3d 513, 519 [86 Cal.Rptr. 76, 468 P.2d 204].) " ' 'It is a well settled rule that determination of the necessity and form of regulations enacted pursuant to the police power "is primarily a legislative and not a judicial function, and is to be tested in the courts not by what the judges individually or collectively may think of the wisdom or necessity of a particular regulation, but solely by the answer to the question is there any reasonable basis in fact to support the legislative determination of the regulation's wisdom and necessity?" ' " (*Remmenga* v. *California Coastal Com.* (1985) 163 Cal.App.3d 623, 629 [209 Cal.Rptr. 628]; quoting from *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation, etc., Com.* (1970) 11 Cal.App.3d 557, 571 [89 Cal.Rptr. 897].)

■ A law regulating or limiting the use of real property for the public welfare does not violate substantive due process as long as it is reasonably related to the accomplishment of a legitimate governmental interest. (*Schad v. Mount Ephraim* (1981) 452 U.S. 61, 68 [68 L.Ed.2d 671, 679, 101 S.Ct. 2176]; *Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 264 [217 Cal.Rptr. 1, 703 P.2d 339]; *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 158 [130 Cal.Rptr. 465, 550 P.2d 1001].) ■ In *Schad v. Mount Ephraim, supra,* at page 68 [68 L.Ed.2d at p. 680], the United States Supreme Court observed that "the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property." "Thus, an ordinance restrictive of property use will be upheld, against due process attack, unless its provisions 'are clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals or general welfare.'" (*Nash v. City of Santa Monica* (1984) 37 Cal.3d 97, 103 [207 Cal.Rptr. 285, 688 P.2d 894].)

■ If a land use regulation "infringes upon a constitutionally protected personal liberty or fundamental right, 'it must be narrowly drawn and must further a sufficiently substantial government interest.'" (*Griffin Development Co. v. City of Oxnard, supra,* 39 Cal.3d 256, 264; quoting from *Schad v. Mount Ephraim, supra,* 452 U.S. 61, 68 [68 L.Ed.2d 671, 679].) But it is only where property regulation implicates a fundamental right or protected personal liberty that the standard of constitutional review is elevated from the traditional rational relationship test to the more restrictive strict scrutiny standard, under which the state bears the burden of establishing not only that it has a compelling state interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose. (*Nash v. City of Santa Monica, supra,* 37 Cal.3d 97, 103.)

Terminal's contention that the ordinance infringes its fundamental right to cease doing business has been rejected by recent opinions of our state high court. In *Nash v. City of Santa Monica, supra,* 37 Cal.3d 97, a property owner challenged a Santa Monica rent control law precluding demolition or conversion of apartment buildings to other uses unless specifically authorized by a permit obtained from the municipality. Under the law permits are granted only upon a finding that "(1) the building is not occupied by persons of low or moderate income, (2) cannot be afforded by persons of low or moderate income, (3) removal will not adversely affect the housing supply and (4) the owner cannot make a reasonable return on his investment." (*Id.,* at p. 101.) The property owner, Nash, sought to circumvent the removal permit application process by claiming that his fundamen-

tal right to go out of the apartment-rental business had—in the absence of any compelling state interest—been impermissibly abridged by ordinance. (*Id.*, at pp. 103-104.)

While acknowledging that the "exercise of state power to force upon an individual a career chosen by the state would surely raise substantial questions of constitutional dimension," the court found that "the indirect and minimal burden imposed upon Nash's asserted liberty interest by the demolition control provisions of the Santa Monica ordinance does not warrant departure from the traditional tests used to determine the validity of economic regulation." (*Id.*, at pp. 103-104.) The court declared: "All regulation of property entails some limitation upon the liberty of the owner; and, to the extent that the regulation limits the uses to which the property may be put, it entails limitation upon the owner's liberty to pursue his chosen occupation or business at that location. . . . Yet, the existence of these legal and de facto limitations upon his freedom of choice do not operate to subject the property regulation to a strict scrutiny test, under modern legal principles." (*Id.*, at p. 104.) In so ruling, the court noted that Nash remained free to receive a fair rate of return on his investment, to withhold rental units from the market as they become vacant, or to sell his property and invest the proceeds elsewhere. (*Id.*, at p. 103.) Finally, the court concluded that the relationship of the Santa Monica ordinance to the public welfare—specifically, the need to preserve low and moderate cost apartment housing—"is both 'real and substantial.'" (*Id.*, at p. 109.)[8]

In *Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d 256, the court found no constitutional flaw in a municipal ordinance imposing stringent standards upon property owners seeking to convert apartment structures to condominiums. Eschewing the strict scrutiny test, the court declared: "Our review of the ordinance is . . . limited to the question of whether the ordinance is reasonably related to a legitimate governmental purpose." (*Id.*, at p. 264.) Then, citing the "obvious purpose" of the law "'to maintain a healthy rental housing inventory,'" (*ibid.*) the court explained: "Our examination of Oxnard's condominium conversion regulations plainly indicates legitimate governmental purposes. Moreover, the op-

---

[8]We acknowledge recent state legislation superseding the holding in *Nash* and prohibiting any public entity from enacting an ordinance compelling "the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease." (Stats. 1985, ch. 1509, § 1.) We are not persuaded, however, by such legislation to depart from the reasoning and rule of *Nash, supra.* The provisions of the new law—effective July 1, 1986,—cannot alter the constitutional analysis of our high court in *Nash.* Nor are we convinced that the effect of the subject ordinance is to compel Terminal to continue to offer its property for rent as residential hotel units; we leave that issue undecided until such time as it may be presented to us in the context of a disputed appeal.

erative provisions of the regulations are directly and reasonably related to these goals. We conclude, therefore, that the regulations . . . are a valid exercise of the city's police power." (*Id.*, at p. 266.)

For the purpose of equal protection and due process analysis, the subject ordinance bears great similarity to the Santa Monica ordinance found constitutional in *Nash.* Terminal remains free to withhold rental units from the market as they become vacant, and can rent empty residential units to tourists in season. Nor does the ordinance restrict its right to sell its property and invest the proceeds in other ventures, or to convert the property to another use by complying with the replacement provisions of the ordinance. Accordingly, Terminal cannot claim a denial of its fundamental right to terminate its residential hotel business. (*Nash* v. *City of Santa Monica, supra,* 37 Cal.3d 97, 104-105.) And when tested according to traditional due process and equal protection standards, there can be little dispute that the ordinance serves a legitimate governmental interest, and does so by means reasonably and directly related to its goals. (*Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d 256, 266; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 684 [209 Cal.Rptr. 682, 693 P.2d 261] (U.S. Supreme Ct. appeal pending [no. 84-1538]); *Nash, supra,* at p. 109; *Kalaydjian* v. *City of Los Angeles* (1983) 149 Cal.App.3d 690, 694-695 [197 Cal.Rptr. 149].)

As an "additional aspect" of its equal protection argument, Terminal claims that the ordinance improperly imposes requirements upon it because of "actions taken by its lessee, in violation of the basic principles set forth in *Dept. of Mental Hygiene* v. *Kirchner* 60 Cal.2d 716 (1964) and *Department of Mental Hygiene* v. *Hawley* 59 Cal.2d 247 (1963)." In *Kirchner* and *Hawley,* our high court declared that where persons are incarcerated in state hospitals for the protection of society, the state may not recoup the expense of such commitment and care from relatives of the confined persons. The basis for the equal protection violation is that society as a whole benefits from the incarceration; "[h]ence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (*Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716-720 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353]; see also *In re Jerald C.* (1984) 36 Cal.3d 1, 7 [201 Cal.Rptr. 342, 678 P.2d 917].)

In our view, the equal protection principles announced in *Kirchner* and *Hawley* do not render the ordinance constitutionally flawed. The City is not seeking reimbursement from Terminal for fees properly chargeable to the public. In fact, the ordinance does not impose fees at all. Only if the prop-

erty owner chooses to convert residential hotel units to another use is replacement demanded. Terminal may thus avoid fees simply by refraining from conversion. We find no equal protection or due process violations.

Terminal also argues that the ordinance effectuates a "taking" of its property in violation of article V of the United States and article I, section 19 of the California Constitutions, contending that the ordinance so restricts the use of its residential hotel property as to amount to a taking requiring just compensation. Terminal equates its property rights with a "bundle of sticks," which, it submits, has been destroyed by the ordinance. We disagree.

■ It is settled that a land use regulation results in a confiscatory "taking" only when the landowner has been deprived of "substantially all reasonable use of his property." (*Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d 256, 266; *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25].) "Even a significant diminution in value is insufficient to establish a confiscatory taking." (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644, 686.)

■ No "set formula" has been provided by the United States Supreme Court to determine when economic injuries caused by public action must be compensated by the government, rather than disproportionately concentrated on a few persons. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) Instead, " 'whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances [in that] case.' " (*Ibid.*; see also *Grupe* v. *California Coastal Com.* (1985) 166 Cal.App.3d 148, 174 [212 Cal.Rptr. 578].) But in *Penn Central,* the court discussed "several factors" that have particular significance on this issue: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. . . . So too, is the character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Id.,* at p. 124 [57 L.Ed.2d at p. 648].)

The ordinance does not result in a permanent physical invasion, such as did the New York law—requiring residential landlords to permit cable television companies to install cable lines on apartment buildings—found con-

fiscatory in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], a case relied upon by Terminal. Only economic *use* of property is affected by the ordinance.

As a regulatory measure, the ordinance is restrictive, but in our view not to such a degree as to amount to a "taking" of property. Terminal is left with the right to sell or trade its property; it has retained the right to use the property in the same manner as before the ordinance, a use for which the property is apparently well suited. Conversion to another use is limited, but permitted upon compliance with stated replacement provisions. There has been no showing by Terminal that its investment-backed expectations have been compromised by the ordinance. Terminal has failed to offer any evidence that it is not receiving a reasonable rate of return on its investment from operation of the residential hotel on the property; nor has any reduction in market value of the property been established. And in any event, a land use regulation which merely decreases the value of property does not constitute a compensable taking. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d 266, 277; *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 514-518 [125 Cal.Rptr. 365, 542 P.2d 237].)

We are concerned that the ordinance places a disproportionate share of the burden of providing low-cost housing upon residential hotel property owners, rather than fairly dispersing the cost of conferring such a social benefit upon society as a whole. But we cannot intrude upon the legislative decision-making process by substituting our views for the wisdom of the Board. (*Remmenga* v. *California Coastal Com., supra,* 163 Cal.App.3d 623, 629.) Established principles of constitutional law define the limits of our inquiry.

Terminal has demonstrated no more than a possible restriction upon more economic uses of its property, which, as observed in *Friedman* v. *City of Fairfax* (1978) 81 Cal.App.3d 667, 677-678 [146 Cal.Rptr. 687], "is simply testimonial to the 'price of living in a modern enlightened and progressive community.'" (Quoting *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 518 [35 Cal.Rptr. 480].) Like most land use regulations, the ordinance may have "'the inevitable effect of reducing the value of regulated properties,'" but even a "'significant diminution in value is insufficient to establish a confiscatory taking.'" (*Griffin Development Co.* v. *City of Oxnard, supra,* 39 Cal.3d 256, 267.) Thus, while we recognize that the ordinance is onerous, we are not convinced that it is so intrusive as to have a confiscatory effect. (*Griffin, supra; Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644, 686; *Grupe* v. *California Coastal Com., supra,* 166 Cal.App.3d 148, 177.)

Terminal's final contention is that it is entitled to an award of attorney's fees under section 1021.5 of the Code of Civil Procedure, which provides, in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate and, (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowance against, but not in favor of, public entities, and no claims shall be required to be filed therefor."

Terminal argues that the instant action has conferred a significant benefit upon the public by ensuring that the City both refers land-use legislation such as the ordinance to the Planning Commission for review prior to adoption and engages in appropriate environmental evaluation of projects which may have a significant effect on the environment. Terminal notes that the City never considered such action before this suit was instituted.

Section 1021.5 was adopted by the Legislature in 1977 as a codification of the private attorney general doctrine developed in the case law. (*Stevens v. City of Glendale* (1981) 125 Cal.App.3d 986, 999-1000 [178 Cal.Rptr. 367].) ▇▇▇ The factors relevant to a determination of entitlement to attorney's fees under the private attorney general theory were articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25, 45 [141 Cal.Rptr. 315, 569 P.2d 1303], as 1) the strength or societal importance of the public policy vindicated by the litigation, 2) the necessity for private enforcement and the magnitude of the resultant burden upon the plaintiff, and 3) the number of people standing to benefit from the decision. (See also *People* ex rel. *Deukmejian v. Worldwide Church of God* (1981) 127 Cal.App.3d 547, 558 [178 Cal.Rptr. 913].) ▇▇▇ The "fundamental objective of the private attorney general doctrine of attorney fees is ' "to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." ' " (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].)

The sole result of Terminal's suit has been to force the City to undertake a threshold environmental evaluation of the effect of the ordinance.[9] The

---

[9]Additionally, the City submitted the ordinance to the Planning Commission for consideration pursuant to charter section 7.501. But we have found that action unnecessary.

benefit conferred thereby upon the public was minimal, however, since a negative declaration was issued after the evaluation. And we have little doubt that Terminal's primary purpose in bringing suit was to pursue and protect its own property rights rather than to further a significant public interest. Accordingly, we conclude that the trial court did not abuse its discretion by denying an award of attorney's fees. (*Boccato* v. *City of Hermosa Beach* (1984) 158 Cal.App.3d 804, 812 [204 Cal.Rptr. 727]; *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 1000 [178 Cal.Rptr. 367]; *Ellerbroek* v. *Saddleback Valley Unified School Dist.* (1981) 125 Cal.App.3d 348, 378 [177 Cal.Rptr. 910].)

That part of the judgment declaring the ordinance invalid due to the failure of appellant to submit the proposal to the Planning Commission is reversed. In all other respects the judgment is affirmed.

Elkington, Acting P. J., concurred.

Holmdahl, J., concurred in the result.