100 Cal.Rptr.2d 1 (2000)
83 Cal.App.4th 239
SAN REMO HOTEL L.P., et al., Plaintiffs, Cross-Defendants and Appellants,
v.
CITY AND COUNTY OF SAN FRACISCO et al., Defendants, Cross-Complainants and Respondents.
No. A083530.
Court of Appeal, First District, Division Five.
August 8, 2000.
As Modified on Denial of Rehearing September 6, 2000.
Review Granted November 21, 2000.
*4 Law Offices of Andrew M. Zacks, Andrew M. Zacks, San Francisco, James B. Kraus, Law Offices of Paul F. Utrecht, Paul F. Utrecht, San Francisco, for Plaintiffs, Cross-Defendants and Appellants.
Louise H. Renne, City Attorney, Andrew W. Schwartz, Deputy City Attorney, for Defendants, Cross-Complainants and Respondents.
STEVENS, J.
Appellants San Remo Hotel L.P., Robert Field, Thomas Field, and T & R Investment Corp. (the Hotel) alleged in the trial court that the Hotel Conversion Ordinance (HCO) as amended in 1990, of the City and County of San Francisco (the City) resulted in an unconstitutional taking of appellants' property. Appellants had originally made their claims in the federal courts, and had initially obtained an injunction from the federal district court forbidding the City from enforcing the HCO as to them. On appeal, however, the Ninth Circuit determined that it was more appropriate for appellants to pursue their claims in the state courts. (See The San Remo Hotel v. City and County of San Francisco (9th Cir.1998) 145 F.3d 1095, 1102-1106 (SanRemo I).)
The state trial court sustained, without leave to amend, the City's demurrers to appellants' allegations that the City carried out an unconstitutional taking when it forbade the Hotel from continuing to operate as a tourist hotel, unless appellants paid the City the amount of $567,000, in the form of a "conversion fee" under the HCO.[1]
We conclude that the Hotel's amended pleadings state causes of action alleging a challenge to the HCO, and the required payment of the mitigation fee under the HCO, as an unconstitutional taking. We therefore reverse the trial court's ruling sustaining the demurrers on this issue.
Appellants also claim the trial court erred by denying their petition for a writ of mandate relating to another separate issue, appellants' contention that the Hotel was as a matter of law a prior nonconforming use in 1987, and therefore it qualified as such under the terms of the North Beach Neighborhood Commercial District (NBNCD) zoning ordinance. This contention presents a pure issue of law over which we must exercise de novo review. The trial court ruled as a matter of law that the operation of the Hotel as a tourist hotel in 1987 was not a lawful prior nonconforming use. However, we conclude that if actual use of the Hotel by tourists were demonstrated, such use as a matter of law could legally be a prior nonconforming use for purposes of the NBNCD, and we therefore must reverse the trial court's ruling on this legal issue, and remand for further proceedings.
In a cross-appeal, the City asserts that the trial court abused its discretion by assessing nominal penalties of only $190 for appellants' purported violations of the HCO and NBNCD by renting rooms to tourists on 190 days. The trial court considered testimony of witnesses and received evidence regarding appellants' attempts to lawfully operate the Hotel while navigating the maze of City regulations and HCO compliance issues, ultimately ordering that only nominal penalties should be imposed. We find no abuse of discretion in imposing such nominal penalties, under the unusual circumstances of this case, and affirm the trial court's ruling as to this issue.

*5 I. FACTS AND PROCEDURAL HISTORY

A portion of this appeal proceeds from a ruling on the City's demurrers, while the remaining portions proceed from rulings after trials, on a petition for writ of mandate and in an action for civil penalties. We first summarize the facts adduced at the trial of the petition for writ of mandate, and in the penalty action, for purposes of providing necessary factual background to those claims.

A. The San Remo Hotel
The San Remo Hotel is a small, 62-unit, three-story hotel in the North Beach or Fisherman's Wharf area of San Francisco. The Hotel was built in 1906, by A.P. Giannini, the founder of the Bank of America, in a Victorian Italianate style. The building was used to temporarily house persons displaced by the great earthquake and fire of 1906. However, in 1916 the City approved the operation of a hotel and restaurant on the site, and thereafter the Hotel has always been used by travelers or other persons who were making short stays in San Francisco, as well as by some long-term or residential guests.
By the early 1970's, the Hotel had fallen on hard times and was in a dilapidated condition, with the City pursuing condemnation proceedings due to fire code violations and other problems. The Hotel was then purchased by Thomas and Robert Field, who restored the building to its former good condition, expending many years of their own labor as well as several hundred thousand dollars. The Field brothers have operated the establishment primarily as a European-style bed and breakfast inn for overnight guests, with between 10 and 20 long-term or residential guests in addition. Appellants have at all relevant times had a permit from the City to operate as a hotel, and the City has always collected local taxes on the Hotel's rentals to tourists.

B. The Hotel Conversion Ordinance (HCO)
The City's board of supervisors enacted an initial "temporary" moratorium on the demolition or conversion of residential hotel units in 1979. (1981 HCO, § 41.3(g), S.F. Admin. Code, hereafter HCO.) The moratorium was assertedly in response to a housing shortage for low-income and elderly residents, caused by the conversion of residential hotels to nonresidential hotels or condominiums. (1981 HCO, § 41.3(a)(c).) The "temporary" moratorium proved to be permanent in 1981, when the board replaced the moratorium with the first version of its HCO, which began to regulate or prevent the conversion of "residential" hotels to other uses. The HCO's stated objective was to alleviate the "adverse impact on the housing supply and on displaced low income, elderly, and disabled persons resulting from the loss of residential hotel units through their conversion and demolition." (1981 HCO, § 41.2.)
In 1990, the City enacted the current version of the HCO, which is in issue here. The 1990 HCO made two significant changes to the preexisting 1981 version of the HCO. First, he 1990 HCO doubled the conversion fee imposed on hotels wishing to convert to other uses. Second, and more critical, is the fact that the 1990 HCO generally forbids the rental of rooms in residential hotels to tourists during the tourist season, absent permission from the City. (1990 HCO, § 41.1 et seq.)
The 1981 HCO provided for a survey to classify all of the City's hotel rooms as either "tourist" or "residential" based on their use as of September 23, 1979. The HCO regulated and prevented all changes after its enactment, unless there was an exemption or the payment of a fee to the City. (1981 HCO, §§ 41.5, 41.6.) Thus, if rooms were rented to tourists on September 23, 1979, the HCO allowed unlimited tourist use of those rooms after that date. Conversely, if rooms were used for "residential" purposes as of that date, which *6 the HCO defined as meaning only that a guest had stayed in the room for 32 days or more, then the 1990 HCO required that the rooms stay in "residential" use forever, or regulated their "conversion" by payment of a fee to the City. (1990 HCO, § 41.12.)
The current, 1990 version of the HCO now places substantial restrictions on owners of residential hotel units that have been classified as "residential." The most salient of these is that the Hotel may not generally rent such rooms to tourists except by special permission of the City. If a hotel owner wishes to convert residential units to other uses, such as short-term tourist rentals, a permit is required. (1990 HCO, § 41.20(a)(1).) A conversion permit will be granted only if the owner agrees to provide "one-for-one replacement of the units to be converted." (1990 HCO, § 41.13(a).) The replacement housing may be provided by 1) constructing new residential hotel rooms limited to that use, 2) rehabilitating existing residential hotel units, or 3) contributing a substantial "inlieu" fee to construct new units. Originally under the 1981 HCO, this fee was 40 percent of the cost of constructing a replacement; now it is 80 percent of the cost of construction, plus site acquisition costs. (1990 HCO, §§ 41.12; 41.13; 41.14.)[2]
In the present case, the City claimed, based upon the results of its 1979 survey, that all 62 units in the Hotel had been occupied by residential guests as of 1979, and therefore no rooms in the Hotel could legally be rented out to overnight guests or tourists, except in compliance with the HCO.
Appellants alleged that the City acted erroneously when it initially classified all the units in the Hotel as "residential" units subject to the HCO; the City's action was based upon a 1979 survey form it sent to the then operator of the Hotel, Mr. Jean Iribarren, who had leased it from appellants; and that "Mr. Iribarren submitted a false declaration, which stated that all of the rooms in the San Remo Hotel were occupied by persons who had resided in their rooms for more than 32 days." (See San Remo I, supra, 145 F.3d at p. 1099.)
All the evidence of record shows the Hotel was always in use by overnight guests and tourists, with residential guests as well. The number of residential guests was always between 10 and 20, but never 62, as the City asserts based upon the 1979 survey, which even the City does not contend was accurate. Using this survey, which it declined to correct, the City asserted that the HCO governed all the rooms in the Hotel as "residential" rooms, and forbade their use by overnight guests absent the City's approval.[3]
The City ultimately assessed the Hotel an "in-lieu" fee of $567,000, or almost $9,000 per "residential" room, which the Hotel paid under protest in 1996, in order to "convert" the Hotel and exempt it from further regulation under the HCO. The Hotel was also required to offer lifetime leases to its long-term tenants, as a condition of this "conversion." The fee of $567,000 would normally have been twice as large, but the Hotel was able to take advantage of a window provided by the 1990 HCO for conversion under the financial provisions of the 1981 HCO, which required the Hotel to provide only 40 percent, *7 not 80 percent, of the replacement cost of new housing. Faced with the prospect of a doubling of the demanded fee unless it acted quickly, the Hotel paid under protest.
The various versions of the HCO have been the subject of numerous lawsuits over the years since the original enactment of its initial versions in 1979 and 1981, and the California Courts of Appeal have previously upheld the 1981 HCO against claims that it violated the principles of due process and equal protection (Terminal Plaza Corp. v. City and County of San Francisco (1986) 177 Cal.App.3d 892, 898, 907-908, 223 Cal.Rptr. 379 (Terminal)), and that the less rigorous 1981 ordinance effected an unconstitutional taking of property without just compensation. (Terminal, supra, at p. 912, 223 Cal.Rptr. 379; Bullock, supra, 221 Cal.App.3d at p. 1089, 271 Cal.Rptr. 44.)
However, we have also held that owners of such hotels must be permitted the right to cease operating as residential hotels, and that the City could not legally exact "ransom" for the exercise of that right. (Bullock, supra, 221 Cal.App.3d at p. 1101, 271 Cal.Rptr. 44.) Also, in commenting upon an earlier version of the HCO, we expressed concerns regarding its fairness to property owners: "We are concerned that the ordinance places a disproportionate share of the burden of providing low-cost housing upon residential hotel property owners, rather than fairly dispersing the cost of conferring such a social benefit upon society as a whole." (Terminal, supra, 177 Cal.App.3d at p. 912, 223 Cal. Rptr. 379.)
In federal district court, the more rigorous 1990 version of the HCO in issue here was initially enjoined as an unconstitutional taking without just compensation, although that ruling was later reversed on statute of limitations grounds. (Golden Gate Hotel Ass'n. v. San Francisco (N.D.Cal.1993) 864 F.Supp. 917, revd., (9th Cir.1994) 18 F.3d 1482, 1487.) There is at present no published ruling by either the federal or state courts which definitively addresses the question of whether the current 1990 version of the HCO may have effected an unconstitutional taking of private property without just compensation.

C. Procedural history of this litigation.

1. Federal Court Proceedings.

As previously mentioned ante, the present litigation began in federal court. In The San Remo Hotel v. City and County of San Francisco, No. C-93-64-WHO, the Federal District Court for the Northern District of California granted an injunction in favor of the Hotel against the operation of the HCO, which the court had held was an unconstitutional taking without just compensation. On appeal, the Ninth Circuit Court of Appeals did not reach the merits of the trial court's ruling that the HCO was unconstitutional, and instead determined that the federal courts should abstain from deciding the controversy, in favor of litigation in the state courts. (San Remo I, supra, 145 F.3d at pp. 1102-1106.) The matter then proceeded in state court.

2. The Demurrers to the Hotel's Claim of an Unconstitutional Taking

The Hotel pleaded its allegations of an unconstitutional taking, both facially and as applied, in our state trial court as claims of inverse condemnation in the Hotel's first amended complaint. In the third cause of action of the first amended complaint, appellants alleged: "The City's ordinances and its administrative actions regarding the San Remo violate plaintiffs' federal and state constitutional rights in that they fail to substantially advance legitimate government interests as required by the Takings Clause of the Fifth Amendment to the United States Constitution and Article I, Section 19, of the California Constitutional." The complaint continued: "The application of the City's ordinances to plaintiffs forces them, and a small group of other property owners, to bear the full *8 cost of providing a general public benefit: housing for low income, elderly and disabled San Francisco residents. This violates the Takings Clause...."
The City filed demurrers to the first amended complaint, contending that appellants facial and as-applied claims of unconstitutionality failed to state a cause of action upon which relief could be granted. The trial court was requested to take judicial notice of the text of the HCO in aid of the demurrers.
The City's demurrer as to appellants' facial challenge in the third cause of action was sustained. Although the basis of the ruling is somewhat unclear from a reading of the order, it appears the trial court ruled as a matter of law that the HCO was facially constitutional. In the trial court's words, "Under applicable case law, Plaintiff cannot state a cause of action challenging the constitutionality of the Hotel Conversion Ordinance...." As to appellants' attempts to plead an unconstitutional taking, as applied, the City's demurrers were overruled, in part, and sustained with appellant granted leave to re-plead its allegations of unconstitutionality as to the City's requirement for payment of the $567,000 mitigation fee under the HCO, applying a "heightened scrutiny" test.
The Hotel endeavored to re-plead, some without leave of court, all of its claims of unconstitutional taking in a second amended and supplemental complaint. For example, the second cause of action alleged that the City had carried out an unconstitutional taking and was liable in inverse condemnation, because the City had erroneously classified the San Remo as containing 62 units of residential "`group housing.'" The third cause of action charged the City with demanding and receiving $567,000 as a "replacement housing fee" under the HCO, which the Hotel claimed was also an unconstitutional taking, and did not advance a legitimate state interest. A fourth cause of action similarly claimed that the City's demand for a $567,000 replacement fee was an unconstitutional taking, and sought a refund of that fee. Finally, the fifth cause of action pleaded that the HCO and the demand for the $567,000 fee, as applied to the Hotel, constituted an unconstitutional taking and justified damages in inverse condemnation.
The trial court sustained the City's demurrers to this second amended and supplemental complaint, without leave to amend. As to the second and third causes of action, the trial court reasoned that no cause of action could be stated, apparently because appellants had paid the City's demanded fee, and had therefore waived the right to challenge it. The fourth and fifth causes of action were found to be a repleading of appellants' facial challenge to the HCO in the third cause of action of the first amended complaint. Because the trial court previously rejected the legal basis for this challenge, the City's demurrers were again sustained, this time without leave to amend.

3. The Petition for a Writ of Mandate as to Zoning Issues.

The Hotel also filed a petition for a writ of mandate, seeking a legal ruling by the trial court that the Hotel was a prior legal nonconforming use under the terms of the NBNCD zoning ordinance, so that it would not require a new use permit under the NBNCD in order to continue to operate as a tourist hotel. The trial court denied the requested relief, finding as a matter of law, that appellants' operation after 1981 as a tourist hotel was not a legal use under the certificate of use issued the Hotel under the HCO. We discuss this matter at greater length in part II. B of this opinion.

4. The Penalty Proceeding and Trial

In a cross-complaint, the City sought the imposition of up to $500 per day in civil penalties against the Hotel for its continued operation as a tourist hotel, allegedly in violation of the HCO and NBNCD. The trial court granted summary adjudication against certain of the Hotel's defenses to *9 the penalty action, which we address, post. The cross-complaint seeking penalties proceeded to a contested trial; and we discuss the relevant facts more fully in part II. C of this opinion. The trial court ordered that appellants should pay penalties of only $190, i.e., one dollar per day for each of the 190 days of alleged violations.

II. DISCUSSION

A. The judgment following the demurrers as to the Hotel's claims of an unconstitutional taking must be reversed.

1. Standard of Review.

"For purposes of ruling on a demurrer, the court assumes the truth of all well-pleaded allegations of a complaint. The ability of the plaintiff to prove them is not in issue." (Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1041, fn. 4, 80 Cal.Rptr.2d 828, 968 P.2d 539, (Diamond).) Instead, the facts alleged must be treated as having been admitted, and we review de novo to determine whether the facts as pleaded could entitle the plaintiff to any legal remedy as a matter of law. (Quelirnane Co. v. Stewart Title Guaranty Co. (1998) 19 Cal.4th 26, 38, 77 Cal.Rptr.2d 709, 960 P.2d 513 (Quelirnane Co.).)
A demurrer merely tests the legal sufficiency of the complaint, not its factual truth. (Hernandez v. City of Pomona (1996) 49 Cal.App.4th 1492, 1497, 57 Cal.Rptr.2d 406.) On appeal, "[w]e give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citations.]" (Lazar v. Hertz Corp. (1999) 69 Cal.App.4th 1494, 1501, 82 Cal.Rptr.2d 368.) In other words, "`plaintiff need only plead facts showing that he may be entitled to some relief [citation].' (Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 496, 86 Cal.Rptr. 88, 468 P.2d 216.)" (Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 572, 108 Cal.Rptr. 480, 510 P.2d 1032; accord, Quelirnane Co., supra, 19 Cal.4th at p. 38, 77 Cal.Rptr.2d 709, 960 P.2d 513; Moore v. Regents of University of California (1990) 51 Cal.3d 120, 125, 271 Cal.Rptr. 146, 793 P.2d 479.)

2. The Level of Scrutiny to be Applied

The parties first dispute the level of scrutiny which we should apply to the HCO, and the $567,000 payment made by the Hotel as a "conversion fee" to avoid the restrictions of the HCO.
The federal Supreme Court has held that a heightened or intermediate level of scrutiny must be applied to an exaction by a governmental unit as a condition of the legal use of property. (See Dolan v. City of Tigard (1994) 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (Dolan); Nollan v. California Coastal Comm'n (1987) 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (Nollan).)
As applied by our Supreme Court in Ehrlich v. City of Culver City (1996) 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 911 P.2d 429 (Ehrlich), the decisions in Nollan and Dolan hold that a discretionary exaction, such as the HCO conversion fee in issue here, may be challenged under the "heightened standard of scrutiny." Such scrutiny is "triggered by a relatively narrow class of land use casesthose exhibiting circumstances which increase the risk that the local permitting authority will seek to avoid the obligation to pay just compensation." (Ehrlich, supra, at p. 868, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
For example, in Nollan, the California Coastal Commission required residential property owners to grant a lateral easement for public access across the seaside of their beach-front property as a condition for approval of a building permit to construct a larger beach house. (Nollan, supra, 483 U.S. at p. 828, 107 S.Ct. 3141.) In Dolan, the City of Tigard, Oregon, required the plaintiff to dedicate a portion of her property to public use as a pedestrian and bicycle pathway as a condition for *10 granting a building permit allowing her to expand her business. (Dolan, supra, 512 U.S. at pp. 377-380, 114 S.Ct. 2309.) In each instance, local government conditioned the approval and issuance of a development permit on a land-use restriction, dedication, or exaction that would have amounted to the uncompensated requisition of private property for public use, but for the claim that the conditions were justified by the ultimate police power to deny a permit altogether. (See Ehrlich, supra, 12 Cal.4th at p. 868, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
Similarly, in Ehrlich, supra, 12 Cal.4th at pp. 862, 867-869, 50 Cal.Rptr.2d 242, 911 P.2d 429, our high court held that a "mitigation fee" of $280,000 imposed by a local government and paid under protest by the property owner, as a condition of development of a property, and as a "replacement" for the recreational facilities formerly operated on the property, should be subjected to heightened scrutiny as a possible taking, because the government may have used its discretionary power over the granting or denying of permits as a means of "leverag[e]" in order to extract a monetary fee from the property owner. As Ehrlich reasoned, "such a discretionary context presents an inherent and heightened risk that local government will manipulate the police power to impose conditions unrelated to legitimate land use regulatory ends, thereby avoiding what would otherwise be an obligation to pay just compensation.... It is the imposition of land-use conditions in individual cases, authorized by a permit scheme which by its nature allows for both the discretionary deployment of the police power and an enhanced potential for its abuse, that constitutes the sine qua non for application of the intermediate standard of scrutiny formulated by the court in Nollan and Dolan." (Ehrlich, supra, at p. 869, 50 Cal.Rptr.2d 242, 911 P.2d 429, italics in original.) In the present case, appellants have also alleged that the City effected a taking when it made a discretionary, individualized, adjudicatory ruling requiring that the Hotel pay $567,000 as a replacement fee under the HCO.
In Ehrlich, our Supreme Court applied the Nollan /Dolan analysis to instances where local government has imposed special monetary exactions on an individual and discretionary basis. The court expressly contrasted such specific, individual exactions with the circumstance in which generally applicable fees or assessments are imposed on a broad class of property owners in a nondiscretionary, ministerial fashion. In the latter case, Ehrlich found there is less risk of an extortionate use of the police power to impose unconstitutional conditions. (Ehrlich, supra, 12 Cal.4th at p. 876, 50 Cal.Rptr.2d 242, 911 P.2d 429.) Thus by contrast, where a regulatory exaction takes the form of a generally applicable fee or assessment, "the courts have deferred to legislative and political processes to formulate `public program[s] adjusting the benefits and burdens of economic life to promote the common good.' [Citation.]" (Ehrlich, supra, at p. 881, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The Hotel's allegations, as pleaded, fit those to which the Nollan/Dolan/Ehrlich heightened or intermediate scrutiny analysis should apply. Like the $280,000 mitigation fee imposed on the particular developer in Ehrlich as a condition for approval of his request that his property be rezoned to permit construction, or the property exacted as a condition of permit approval in Nollan and Dolan, the monetary sum of $567,000 exacted by the City here is a fee, exaction or payment in a "discretionary context" which presents "an inherent and heightened risk that local government will manipulate the police power" in a manner which "avoid[s] what would otherwise be an obligation to pay just compensation." (Ehrlich, supra, 12 Cal.4th at p. 869, 50 Cal.Rptr.2d 242, 911 P.2d 429.) In the case under review, as in Ehrlich, it "is the imposition of land-use conditions in individual cases, authorized by a permit scheme *11 which by its nature allows for both the discretionary deployment of the police power and an enhanced potential for its abuse, that constitutes the sine qua non for application of the intermediate standard of scrutiny formulated by the court in Nollan and Dolan." (Ehrlich, supra, at p. 869, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The City acknowledges these authorities, but disputes their application in the matter under review.[4] The City suggests Nollan, Dolan, and Ehrlich, supra, may have been wrongly decided when they applied heightened scrutiny to the required dedications of property, or monetary fees, in issue in those decisions.[5] We are bound by and follow the decisions of our Supreme Court. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937 (Auto Equity).) The decisions of the federal Supreme Court also indicate that heightened scrutiny is warranted, and those decisions are binding upon both the California Supreme Court and ourselves as to issues of federal constitutional law. (See ibid.) Further, we note that subsequent decisions of both the federal and California Supreme Courts have reaffirmed the application of heightened scrutiny in these limited circumstances, where it is alleged that a taking resulted from a specific, discretionary decision of the government with reference to a particular property, rather than from a law of general application which applies to all land. (See, e.g., City of Monterey v. Del Monte Dunes (1999) 526 U.S. 687, 119 S.Ct. 1624, 1635, 143 L.Ed.2d 882; Santa Monica Beach, Ltd. v. Superior Court (1999) 19 Cal.4th 952, 966, 81 Cal.Rptr.2d 93, 968 P.2d 993; cf. also Eastern Enterprises v. Apfel (1998) 524 U.S. 498, 118 S.Ct. 2131, 2149, 2154, 2156, 141 L.Ed.2d 451.)
In the context of this particular case, the heightened level of scrutiny is particularly appropriate since the $567,000 mitigation fee was imposed "in lieu" of taking the Hotel's property itself, and in order to accomplish the condemnation of the same value of real property for public purposes. The 1990 version of the HCO explicitly states that it demands increased fees from property owners, since other official sources of public funding for low-cost housing became more difficult for the City to procure, thereby shifting the burden of public funding for low-cost housing to the property owner. (1990 HCO, § 41.13.) This is potentially the type of individual taking of property by the government, for an asserted public purpose, which the jurisprudence developed under the takings clause was designed to protect citizens against, and for which heightened scrutiny is appropriate. (See Ehrlich, supra, 12 Cal.4th at pp. 869, 876, 50 Cal.Rptr.2d 242, 911 P.2d 429.)

3. The City's Demurrer to the Facial Challenge, as Pled in the Second, Amended Complaint

Appellants sought to plead both a facial challenge and an as-applied constitutional challenge to the HCO in the first amended complaint. At the appellate oral argument, the parties acknowledged that *12 appellants' facial challenge to the constitutionality of the HCO was contained in the third cause of action of this first amended complaint, and that the question of whether the trial court ruled correctly on this issue was properly before us on appeal.
However, after the trial court had initially sustained the City's demurrer to the Hotel's attempt to allege a facial challenge to the HCO, appellants re-pled all of its takings allegations in a second amended and supplemental complaint. Insofar as the fourth and fifth causes of action attempted to restate a facial challenge to the HCO, appellants failed to seek leave of court to replead such causes of action. More importantly, the present state of these pleadings is insufficient to allow us to fully assess the ultimate legal validity of the facial constitutionality of the HCO. If appellants desire to make such a challenge, they might seek leave to amend their pleading to reassert a facial challenge in additional detail, so that the trial court may rule on this issue with the benefit of a more complete record.

4. The City's Demurrer to Appellants' As-Applied Challenge Should Have Been Overruled, Because the Hotel has Properly Alleged an Unconstitutional Taking.

By the provisions of the takings clause in the Fifth Amendment to the United States Constitution, and the California Constitution, article I, section 19, the government is prohibited from taking private property for public use without just compensation.[6] A governmental regulation of property may in certain circumstances constitute a taking for which just compensation must be granted. (See Penna. Coal Co. v. Mahon (1922) 260 U.S. 393, 415-416, 43 S.Ct. 158, 67 L.Ed. 322 (Mahon); Ehrlich, supra, 12 Cal.4th at p. 876, 50 Cal.Rptr.2d 242, 911 P.2d 429.) Here, for the reasons discussed, ante, we must also apply "heightened scrutiny" to the HCO and the $567,000 fee or exaction by the City under the HCO. Under that standard, we determine whether the Hotel's allegations regarding the $567,000 fee pled a claim for an unconstitutional taking, or whether as a matter of law the fee constituted a valid regulatory action intended to respond to the effects of the "conversion" of the Hotel from a "residential" use. (Ehrlich, supra, at p. 876, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The purpose of the takings clause, as authoritatively construed by the federal and California Supreme Courts, is to prevent governments from taking private property for public goals without payment of just compensation. The building and maintaining of affordable housing for the indigent or necessitous may be precisely such a worthy public goal, but governments may not simply take private property without just compensation for such a purpose. The goal of modern takings jurisprudence is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (Armstrong v. United States (1960) 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554; accord, Ehrlich, supra, 12 Cal.4th at pp. 880-881, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
Under these precedents, we conclude that the following legal standard *13 should be applied to determine the sufficiency of the Hotel's pleadings. The Hotel, like any other property owner challenging a monetary exaction under the takings clause, may attempt to show, under the heightened scrutiny standard, that there is no proof of "both an `essential nexus' or relationship between the permit condition and the public impact of the proposed development, and of a `rough proportionality' between the magnitude of the fiscal exaction and the effects of the proposed development." (Ehrlich, supra, 12 Cal.4th at p. 860, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The allegations of the Hotel's pleadings question whether the City can show, under the heightened scrutiny standard, that the worthy goals enunciated in the HCO were served at all by the exaction of a conversion fee under the HCO from appellants. As we have stated ante, appellants alleged the City erroneously classified all the units in the Hotel as "residential" units subject to the HCO. It is asserted that the Hotel was always used by overnight guests and tourists, with some residential guests as well. Historically, the number of residential guests is claimed to have always been between 10 and 20, and not 62, as the City asserts based only upon the 1979 survey. Using this survey, the City claimed that the HCO governed all the rooms in the Hotel as "residential" rooms, and forbade their use by overnight guests unless the City approved. The result was the payment by appellants of a conversion fee for each of the 62 rooms to avoid the claimed illegality under the HCO.
In addition, appellants pleaded that they were required to offer lifetime leases to all of the current residential guests, none of whom were evicted as a result of the "conversion" of the Hotel from residential use: "[N]ot only is there an abundance of vacant residential hotel units available in San Francisco, no residents protected by the HCO will be displaced by such continued commercial use." Because the same number of residential guests will reside at the Hotel after the "conversion" as before, appellants contend there will be no actual loss of residential units as a result of the "conversion," and that the only apparent effect of the "conversion" will be appellants' payment of $567,000, which the City may someday use to build affordable public housing elsewhere. The 1990 version of the HCO requires increased fees from property owners, because other official sources of public funding for low-cost housing became more difficult for the City to procure, and thus a greater burden of public funding is shifted to the property owner. (1990 HCO, § 41.13.)[7] Affordable housing for the indigent may be a worthy goal, but it is also an expense traditionally and rightly borne by society as a whole. (See Ehrlich, supra, 12 Cal.4th at pp. 880-881, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The Hotel's pleadings essentially state there is no "`essential nexus'" or "`rough proportionality'" between this governmental exaction and the purported objects to be remedied by the exaction. (See Ehrlich, supra, 12 Cal.4th at pp. 880-883, 50 Cal.Rptr.2d 242, 911 P.2d 429.) In this regard, appellants claim there is no such rough proportionality in the HCO conversion fee imposed, and that the exaction is not based upon the number of residential guests displaced (which would be zero) or on relocation costs for guests (again zero) or even on the number of rooms occupied by residential guests (about 10). Instead, it is alleged, the fee is based upon the undeniable fiction that all of the Hotel's 62 rooms are occupied by residential guests, thereby requiring appellants to pay for the construction of "replacements" for all those rooms. The foregoing circumstances, as pleaded, demonstrate the absence of the required constitutional "`essential nexus'" or "`rough proportionality.' " (See Ehrlich, supra, at pp. 880-883, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
*14 We also find instructive the only published decision by a state's highest court dealing with any ordinance similar to San Francisco's HCO, the decision of New York's Court of Appeals in Seawall Associates v. City of New York (1989) 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059, 1061-1073, cert. den. (1989) 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (Seawall). This decision found a similar New York City ordinance, which likewise forbade the conversion of residential hotels except upon payment of large fees, to be unconstitutional as a violation of the takings clause. (Seawall, supra, 544 N.Y.S.2d 542, 542 N.E.2d at pp. 1061-1073.)
Seawall found the similar New York ordinance regarding residential hotels to be an unconstitutional taking, because there was no required constitutional nexus, and because the provisions of the residential hotel ordinance "inevitably force property owners `alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' (Armstrong v. United States, supra, 364 U.S. at 49 [80 S.Ct. 1563]). Because the owners are, by the terms of the law, afforded no compensation, [the residential hotel ordinance], we hold, is facially invalid, under the `Takings' Clauses of both the Federal and State Constitutions [citations]." (Seawall, supra, 544 N.Y.S.2d 542, 542 N.E.2d at pp. 1070-1071, fn. omitted.)
The City suggests Seawall is factually distinguished because the New York ordinance required residential hotels to continue to stay in business and rent out rooms to residential guests, thereby accomplishing a physical occupation of the hotels' property. However, we question whether a physical occupation is always necessary to accomplish a taking, since the "mitigation fee" to replace the sports facilities in Ehrlich was not a physical occupation, but rather a taking of money. Here, the alleged taking by the City nonetheless did contemplate a government-mandated physical occupation, for the Hotel was required to offer lifetime leases to its residential guests. A hotel which is required to offer such lifetime leases cannot close down or go out of business, except after the end of all tenant lives in being. In addition, the City rezoned the Hotel's property so that it could only be used as a residential hotel, and not continue in use as a tourist hotel, a subject we discuss, post. And finally, the 1990 version of the HCO, but not the previous versions of the HCO, required the Hotel to rent out its rooms to residential guests during the winter season, then forbade eviction of those residential guests during the summer tourist season, or else forbade the Hotel from renting to tourists at all.
Appellant's claims are virtually indistinguishable from Seawall, in that the Hotel was required to submit to a physical occupation of its property except upon payment of a large conversion fee, circumstances found to constitute a taking in Seawall.[8] We can find no principled basis on which to distinguish Seawall from the case before us. Of course, in the context of the present case, we need not go so far as Seawall, in finding an unconstitutional taking; we need only hold that the Hotel has properly alleged such a taking, and that those allegations should have survived the City's demurrers, and should be put to proof in the trial court.
The numerous other authorities cited by the City fail to establish that the demurrers were properly sustained as to the Hotel's allegations of an unconstitutional taking. The City notes in passing that the prior version of the HCO was upheld by *15 other divisions of this District in Terminal, supra, 177 Cal.App.3d at pp. 907-909, 223 Cal.Rptr. 379, and Bullock, supra, 221 Cal. App.3d at p. 1089, 271 Cal.Rptr. 44.
However, Terminal did not deal with the present version of the HCO, but rather with one that was much less rigorous. Unlike its earlier version, the 1990 HCO generally forbids the rental of rooms in residential hotels to tourists during the tourist season. (1990 HCO, § 41.1 et seq.) Nor did Terminal address the question of whether the HCO constituted a taking, but instead reached the conclusion that the 1981 version did not violate equal protection and due process rights, while nevertheless expressing concern "that the ordinance places a disproportionate share of the burden of providing low-cost housing upon residential hotel property owners, rather than fairly dispersing the cost of conferring such a social benefit upon society as a whole." (Terminal, supra, 177 Cal.App.3d at p. 912, 223 Cal.Rptr. 379.) Similarly, the appeals court in Bullock, supra, did not consider the 1990 HCO, but the 1981 version, which not even the Hotel contends would involve an unconstitutional taking.
The City also contends that because appellants paid the amount demanded by the City, that is, by paying $567,000 under protest, the Hotel has waived the right to challenge that taking as alleged in its second amended complaint, second and third causes of action. This argument, if accepted, would prevent most enforcements of the takings clause where the takings had already occurred. We have difficulty accepting the logic of the City's argument, since the Hotel's forced payment of the demanded sum is alleged in the pleadings in order to show a taking, as opposed to a voluntary and knowing relinquishment of the Hotel's rights. The City's argument is also at odds with Ehrlich, because the holding of that case allows a property owner to pay a demanded fee under protest, and then challenge the fee as a taking. This argument is also unduly broad and, if accepted, would seemingly bar judicial review of completed takings accomplished by a property owner's payment under protest as a result of immediate governmental compulsion, with no judicial remedy. Our state Supreme Court has rejected that possibility. (See Ehrlich, supra, 12 Cal.4th at pp. 863, 867-869, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
The position argued by The City is also not supported by its citation to Pfeiffer v. City of La Mesa (1977) 69 Cal.App.3d 74, 78, 137 Cal.Rptr. 804 (Pfeiffer). Pfeiffer dealt with a building permit application, which is not in issue here. Specifically, Pfeiffer considered a condition requiring construction of a storm drain on the property, and held that a builder who had accepted such a condition on his building permit could not first accept the permit, and then sue to overturn the conditions. The builder was required to pursue a mandamus action to remove the offending conditions. (Ibid.) The instant case is not one in which the City could legitimately impose conditions upon the granting of a building permit, as was the case in Pfeiffer, but instead we consider here a permit allowing an existing use to continue, without new construction. Since there is no new construction necessary, the permit in question here cannot be justified as a legitimate response to the impact of new construction or development. Of course, the Pfeiffer court also did not have the benefit of the many cases decided in this area since 1977, most especially Ehrlich, supra, 12 Cal.4th at pp. 864-867, 50 Cal.Rptr.2d 242, 911 P.2d 429.
The City's reliance on Pfeiffer is misplaced for yet another related reason. Since Pfeiffer was decided, the Legislature has adopted the Mitigation Fee Act, Government Code section 66000 et seq. The Mitigation Fee Act allows a property owner to pay a governmentally imposed fee under protest, and then litigate its validity, as our Supreme Court found in Ehrlich, supra, 12 Cal.4th at pp. 864-867, 50 Cal. Rptr.2d 242, 911 P.2d 429. Consequently, *16 the authority that the City cites to support its contention, that appellants have waived the right to challenge the alleged taking, is unpersuasive.[9]
For the first time on appeal, the City attempts to raise other arguments which were not before the trial court on demurrers, and which concern such matters as the applicable statute of limitations. For example, it is now suggested (although this argument was not made in its demurrers or elsewhere during the proceedings below) that the Hotel's 1993 action challenging the 1990 HCO is somehow barred by the applicable five-year statute of limitations. (See Baker v. Burbank-Glendale-Pasadena Airport Authority (1985) 39 Cal.3d 862, 867-868, 218 Cal.Rptr. 293, 705 P.2d 866; Hensler v. City of Glendale (1994) 8 Cal.4th 1, 23-24, 32 Cal.Rptr.2d 244, 876 P.2d 1043 [applying five-year statute of limitations contained in Code Civ. Proc, §§ 318, 319].) It also claims that there were other miscellaneous pleading errors in the Hotel's complaint. However, we reject these arguments because they were not properly raised below. (See Franz v. Board of Medical Quality Assurance (1982) 31 Cal.3d 124, 143, 181 Cal. Rptr. 732, 642 P.2d 792.)
We recognize that the HCO may be a well-intentioned measure intended to aid persons on limited incomes by providing affordable housing, but even well intentioned measures may create unconstitutional takings. (See Nollan, supra, 483 U.S. at pp. 828-835,107 S.Ct. 3141 [protection of public access to scenic beaches]; Dolan, supra, 512 U.S. at pp. 377-580, 114 S.Ct. 2309 [preservation of "green-ways" and creation of pedestrian trail]; Ehrlich, supra, 12 Cal.4th at p. 862, 50 Cal.Rptr.2d 242, 911 P.2d 429 [government-required mitigation fee of $280,000 to replace the sports complex and fitness center that the property owner had closed].)

B. The Hotel as a Lawful Non Conforming Use
On a separate issue of law, we must rule on a zoning question relating to the operation of the Hotel, as this District did in Bullock, supra, 221 Cal.App.3d at p. 1101, 271 Cal.Rptr. 44.
Appellants' petition for a writ of mandate sought a legal ruling by the trial court that the Hotel was a prior legal nonconforming use under the terms of the NBNCD zoning ordinance, so that it would not need a new conditional use permit under the NBNCD to continue its operation as a tourist hotel. The trial court denied the requested relief, finding as a matter of law that the Hotel's operation in 1987 as a tourist hotel was in violation of the provisions of the HCO.
Appellants contend that the City has buttressed the HCO through the enactment of zoning ordinances designed to prevent residential hotels from obtaining permits to operate as tourist hotels, unless a conversion fee is paid to the City. Among the more recent zoning ordinances was the enactment of the NBNCD in 1987. If the Hotel could not show a prior nonconforming use, it could have been required to obtain a conditional use permit for the existing tourist operations.
It is well established that a new zoning ordinance does not generally render illegal a prior lawful nonconforming use. (See Hansen Brothers Enterprises, Inc. v. Board of Supervisors (1996) 12 Cal.4th 533, 551-552, 48 Cal.Rptr.2d 778, *17 907 P.2d 1324.) "The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected." (Edmonds v. County of Los Angeles (1953) 40 Cal.2d 642, 651, 255 P.2d 772 (Edmonds).)
The Hotel argued that as a matter of law it was a lawful nonconforming use at the time the City enacted the NBNCD zoning ordinance in 1987, as well as at the time of prior planning code changes in 1984. If the Hotel, and the rental of its rooms to tourists, was a lawful nonconforming use at the time the NBNCD zoning ordinance was enacted, appellants would not be required to comply with the new NBNCD zoning law or obtain City permission to continue to operate as a tourist hotel.
The trial court apparently assumed in its decision that even if the Hotel was operating such an actual use by renting rooms to tourists throughout the 1980's, this prior use was not a legal use. The only question before us involves the legality of the use at that time. The legality of a prior nonconforming use is a pure issue of law, over which we must exercise de novo review. (Bauer v. City of San Diego (1999) 75 Cal.App.4th 1281, 1289, 89 Cal.Rptr.2d 795.)[10]
Here, the City argued that appellants failed to demonstrate the legality of the prior use, and that because the Hotel's rooms were classified as "residential" for purposes of the HCO, by virtue of the survey form returned by Mr. Iribarren, the Hotel's rentals to tourists under the HCO were therefore not a lawful use. Consequently, the City argued that as a matter of law no legal use was demonstrated.[11]
However, the classification of rooms for purposes of the HCO is not determinative as to this zoning issue under the NBNCD. The 1981 HCO and the City allowed legal tourist use of vacant "residential" rooms at the Hotel during the tourist season, and the HCO itself was not enacted as a zoning law to govern the legality of such uses in different neighborhoods. (Terminal, supra, 177 Cal.App.3d at p. 902, 223 Cal. Rptr. 379.) We must look to the local zoning laws applicable to the Hotel in assessing the legality of the prior use for zoning purposes. (See City of Ukiah v. County of Mendocino (1987) 196 Cal.App.3d 47, 56-57, 241 Cal.Rptr. 585.)
The Hotel in the 1980's was in a commercial district allowing hotels, and had previously obtained a use permit from the City to operate as a hotel. The City's local zoning laws applicable to hotels in the early 1980's made no distinction between the use permits for hotels based upon their "residential" or "tourist" status under the HCO. Thus, such Hotel rentals to tourists in the 1980's would have been legal, under the City's planning code then in effect. We therefore conclude that the Hotel could be an existing legal nonconforming use under the NBNCD, notwithstanding the 1981 certificate of use. (See Edmonds, supra, 40 Cal.2d at p. 651, 255 P.2d 772.)[12]
*18 Our reasoning accords with a written opinion letter drafted by the city attorney and provided for the City's board of supervisors in 1981, when the HCO was under consideration for enactment. The formal opinion letter, no.81-54, signed by the city attorney's own expert on such matters, Burk Delventhal, and by the city attorney, acknowledged and advised the board of supervisors that the 1981 HCO could lawfully be enacted without a prior hearing before the Planning Commission, since the HCO did not operate as a zoning law[13] and would not make illegal the operations of commercial establishments such as the Hotel which rented rooms to tourists: "Under this concept [of a legal nonconforming use], uses or structures which are no longer permitted under present land use ordinances but which were lawfully permitted at the time of their inception or construction, are permitted to continue to exist.... The adoption of an ordinance such as the hotel conversion ordinance does not render an existing structure or use a nonconforming structure or use." (Italics added.)
The City makes several other arguments which are without merit. For instance, the City contends that since there was undisputed evidence that residential guests used some rooms of the Hotel, therefore all tourist uses of the Hotel's rooms must have been illegal. This is a non sequitur. The fact that some rooms at the Hotel were used by residential guests did not render all tourist uses of those rooms, or the Hotel in general, illegal under the 1981 HCO. Likewise, the fact that the City's survey classified all the rooms of the Hotel as "residential" in 1979 did not prevent their legal use under the 1981 HCO for tourist rentals. The designation of a unit as "residential" for purposes of the 1981 HCO did not preclude the rental of this unit for summer tourist use when the room was vacant.
Nor are we impressed by the City's belated attempt to disavow the use permit for a "hotel," which it had always issued to appellants, in favor of an attempt to squeeze the Hotel into another legal category of "group housing," a miscellaneous non-commercial, non-tourist category applicable to boarding houses, communes, fraternity houses, and the like, which are permitted in residential areas under S.F. Planning Code section 209.2. The Hotel remained at all relevant times factually and legally a hotel renting to tourists, not a commune, fraternity house or any of the other uses specified in the "group housing" category. Appellants had been renting to tourists long before the enactment of the HCO and the enactment of the NBNCD. If appellants were not operating a "hotel," then one might wonder why the City always issued to it a use permit as a hotel, collected hotel taxes on its tourist rentals as a tourist hotel, and required a "mitigation fee" under the HCO when it was "converted" from a residential "hotel" to a tourist "hotel."[14] In the final analysis, whether the City chose to call the Hotel a "hotel," a "group housing," or call it by any other name, it would have remained a lawful nonconforming use if actual tourist use were shown. (See Edmonds, supra, 40 Cal.2d at p. 651, 255 P.2d 772.)
*19 In the present case, the trial court did not explicitly reach the issue of actual use of the Hotel, since the court accepted the city's argument that any such actual use would not be a lawful use. The trial court's ruling on this legal issue precluded it from reaching the factual issue of an actual use. We must reverse and remand this issue to the trial court, so that it may make factual findings regarding the actual use of the Hotel in the relevant period.[15] In light of those factual findings, the trial court should enter a new ruling on the Hotel's petition for writ of mandate.

C. The penalty trial
The City contends in its cross-appeal that the trial court erred by imposing only nominal penalties of $190, or one dollar per day, against the Hotel as a result of the City's cross-complaint for civil penalties, alleging violations of the HCO and NBNCD. Those violations arose because the Hotel had rented rooms to tourists, purportedly in violation of the HCO and NBNCD.
We may review the trial court's decision after the trial of this issue only for an abuse of discretion. (See People ex rel. Smith v. Parkmerced Co. (1988) 198 Cal. App.3d 683, 692, 244 Cal.Rptr. 22; cf. also People v. Thygesen (1999) 69 Cal.App.4th 988, 992, 81 Cal.Rptr.2d 886.) We find none.
Although the Hotel did rent rooms to tourists, purportedly in violation of the 1990 version of the HCO on 190 days after the federal court lifted its injunction against the HCO, we agree with the trial court that at most only nominal penalties were required, in the particular circumstances of this case.[16]
Although the City contends the trial court was required to set the penalty much higher, so as to accomplish "disgorgement" of the more than $100,000 which the Hotel earned by renting to tourists during the 190 days in issue, we can find no authority necessarily requiring such "disgorgement" in the form of penalties. In addition, the trial court was certainly in the best position to consider circumstances such as the Hotel's payment of a $567,000 conversion fee; the extensive testimony from appellants regarding their own efforts to restore and legally operate the Hotel; as well as the testimony of a 20-year resident of the premises, in which the Hotel's owners were praised as model landlords who had saved the Hotel from ruin and had thereby undoubtedly saved the witness from homelessness.
Under these circumstances, we conclude that the trial court did not abuse its discretion by imposing only nominal penalties.[17]

III. DISPOSITION

The judgment is reversed in part, affirmed in part, and remanded in part, as follows. With respect to the Hotel's first amended complaint and its second amended and supplemental complaint, the judgment is reversed and the cause is remanded to the trial court with directions to vacate those portions of its judgment of May 5, 1998, that sustained the City's demurrers without leave to amend, and to enter a new order in conformity with this opinion. The judgment is also reversed to the extent the trial court ruled that the Hotel was not a legal nonconforming use, *20 and that matter is remanded with instructions to the trial court to enter a new order on the Hotel's petition for writ of mandate, in conformance with the views expressed herein. The judgment is affirmed as to the penalty of $190 imposed on the City's cross-complaint. The Hotel shall recover costs on appeal.
JONES, P.J., and KRAMER, J.[*], concur.
NOTES
[1] This District obliquely characterized the required conversion fee under the HCO as "ransom" in Bullock v. City and County of San Francisco (1990) 221 Cal.App.3d 1072, 1101, 271 Cal.Rptr. 44 (Bullock ).
[2] The City relies on other federal, state, and local funding sources for public housing in order to provide the remaining 20 percent of the replacement costs. The 1990 version of the HCO states that the increase in the percentage to be paid by the property owner resulted because other official sources of public funding became more difficult for the City to procure, and therefore a greater burden of the public funding was shifted to the property owner. (1990 HCO, §§ 41.3(m); 41.13.)
[3] The Hotel alleged it had filed an application with the City in 1990 to correct the residential designation of the rooms and legalize its use of tourist rooms under the HCO. The City's board of supervisors denied the Hotel's administrative appeal, on a vote of six to five. No relief was granted by the City until the Hotel paid the $567,000 conversion fee in late 1996.
[4] The City agreed in the trial court that this heightened standard of scrutiny should be applied to the $567,000 mitigation fee.
[5] The City now argues that the HCO is similar to a zoning law of general application, and therefore heightened scrutiny does not apply. However, this ordinance is not a general zoning law which, for example, forbids the building of new factories on all properties in San Francisco. (Terminal, supra, 177 Cal.App.3d at p. 902, 223 Cal.Rptr. 379 [HCO does not regulate property as a zoning law].) To the contrary, appellants alleged that the HCO affected only them and a small group of other property owners, leaving unregulated all of the many thousands of other commercial and residential properties in the City. The $567,000 mitigation fee obviously was not imposed on every other property in the City. Consequently, a heightened level of scrutiny is proper, because this is the type of particularized governmental exaction imposed upon a property owner which was seen in Ehrlich. (See Ehrlich, supra, 12 Cal.4th at p. 876, 50 Cal.Rptr.2d 242, 911 P.2d 429.)
[6] The takings clause of the Fifth Amendment to the United States Constitution provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." The analogous provision of the California Constitution, article I, section 19, reads in pertinent part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." We recognize that our Supreme Court has held that this provision of the California Constitution is more protective of private property than the federal Constitution (see Varjabedian v. City of Madera (1977) 20 Cal.3d 285, 296-298, 142 Cal.Rptr. 429, 572 P.2d 43), but for present purposes we will assume the federal and state rights are materially equivalent, since both would indicate an unconstitutional taking has occurred under the facts as alleged by the Hotel.
[7] The City received the money 4 years ago, but has not yet spent it on any affordable housing.
[8] The City also attempts to distinguish Seawall because the New York ordinance was designed to prevent homelessness, by providing affordable housing, whereas the City now claims that the HCO has nothing to do with the problem of homelessness, and is simply intended to provide affordable housing as an end in itself. The basis for the City's claimed distinction is not apparent, since both the New York and San Francisco ordinances appear to have been designed to provide low-cost housing to the indigent, a public goal, at private expense.
[9] The payment of the City's "conversion fee" in return for favorable action on the Hotel's request for a permit to convert and operate as a tourist hotel was also a mitigation fee for a "development" under the provisions of the Mitigation Fee Act, Government Code sections 66000 and 66020. The Mitigation Fee Act adopts the very broad definition of "development" fees set forth in Government Code section 65927, including any "change in the density or intensity of use of land." The "conversion" of the Hotel required a change in the intensity of use of the land, pursuant to the City's planning code, which requires issuance of a new conditional use permit for the intensification of the use of land. The City does not now contend otherwise, although it contested this issue in the trial court.
[10] The City so informed the trial court, conceding that the issue before the court was "an issue of pure law."
[11] The City also contends the survey is final and binding on the Hotel because no appeal was filed form the result of the survey within 10 days. However, appellants' pleadings allege: "45. Plaintiffs did not receive any notice that a declaration was required nor any notice that Mr. Iribarren had submitted his false declaration. The 1981 Hotel Ordinance only allows appeals for 10 days after the initial unit usage report was issued, which plaintiffs could not have filed because they had no notice of the false declaration nor the City's initial usage report." In this regard, appellants have alleged that the application of the HCO and the survey to their property effected an unconstitutional taking. We can find no language in the HCO or other relevant authority which would support the City's argument that the failure to file an appeal requires that the survey is final and binding.
[12] In light of our ruling on this issue, we need not address the other contentions made by the parties as to whether such an application of the 1990 HCO, together with the NBNCD, would have been preempted by state laws outlawing commercial rent controls, an issue as to which the trial court granted summary adjudication. (See Civ.Code, § 1954.26, subd.(d).) Similarly, we need not take judicial notice of the legislative history of state laws on that issue, since we find them irrelevant.
[13] The District agreed with the city attorney's position in that respect in Terminal, supra, 177 Cal.App.3d at p. 902, 223 Cal.Rptr. 379, where we held that the HCO "does not regulate land use in the same manner as zoning laws."
[14] The 1990 HCO also provides, in section 41.4, subdivision (r): "A tourist hotel shall be considered a commercial use pursuant to City Planning Code Section 216(b) and shall not be defined as group housing permitted in a residential area under City Planning Code Section 209.2." In the present case, the Hotel was always a hotel renting to tourists, and therefore not a "group housing."
[15] The trial court may also consider whether it is appropriate to remand the matter to the administrative agency for the development of a more complete administrative record as to actual use in this period, and the entry of a new administrative ruling in conformance with the views expressed in this opinion.
[16] In light of this ruling, we need not address the Hotel's additional contention that the amount of the penalty could not exceed the $5,000 bond set by the federal court for the federal injunction, which was another of the legal defenses rejected by the trial court on summary adjudication.
[17] The Hotel does not challenge the amount of the penalties imposed.
[*] Judge of the San Francisco Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.